**NATIONAL REJECTORS, INC., a dissolved Missouri corporation, and National Rejectors, Inc. (formerly U. M. Investment Co.), a Missouri corporation, Respondents (Plaintiffs),**

v.

**Rollyn C. TRIEMAN, Albin S. Pierz, Fred J. Melvin, Coin Acceptors, Inc., a Missouri corporation, and The Vendo Company, a Missouri corporation, Appellants (Defendants).**

No. 50568.

Supreme Court of Missouri,
En Banc.

Sept. 12, 1966.

Rehearing Denied Dec. 12, 1966.

4

Albert E. Jenner, Jr., Prentice H. Marshall, Chicago, Ill., Walter R. Mayne, H. M. Stolar, Stuart Symington, Jr., St. Louis, Raymond, Mayer, Jenner & Block, Chicago, Ill., Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Stolar, Kuhlmann, Heitzmann & Eder, St. Louis, of counsel, for respondents.

Thomas L. Croft, Terrence L. Croft, Coburn, Croft & Kohn, St. Louis, Donald E. Johnson, Don M. Bradley, Hovey, Schmidt, Johnson & Hovey, Kansas City, James M. Douglas, Thompson Mitchell Douglas & Neill, St. Louis, Albert F. Hillix, Hillix, Hall, Childers, Brown & Hoffhaus, Kansas City, for appellant Vendo Co.

Edmund C. Albrecht, Jr., Albrecht & Homire, Lawrence H. Cohn, Cohn & Powell, St. Louis, for appellants Rollyn C. Trie-

man, Albin S. Pierz and Coin Acceptors, Inc.

WELBORN and PRITCHARD, Commissioners.

This is an action for injunctive relief and damages, based upon alleged misappropriation of trade secrets and unfair competition. A separate trial was had on the injunctive issues, resulting in a judgment and decree in favor of plaintiffs. Defendants appealed and the injunction was stayed (except as to defendant Melvin) upon the filing of an appeal bond in the amount of $1,250,000.00.

The principal party plaintiff in this action is National Rejectors, Inc., a Missouri corporation engaged in the manufacture and sale of, among other products, slug rejectors and electrical coin changers. Joined as a party plaintiff is a now dissolved Missouri corporation, also known as National Rejectors, Inc., and sometimes referred to herein as "Old" National. Old National was incorporated in 1935 as National Slug Rejectors, Inc. In 1947, its corporate name was changed to National Rejectors, Inc. Old National was primarily a family-owned corporation, with the Fry and Gottfried families owning equal shares of the Class A voting stock. Class B nonvoting stock of Old National was owned by some of its employees.

In 1956, the Gottfried family sold their Old National Class A stock to U. M. Investment Co., a wholly owned subsidiary of Universal Match Corporation. On January 29, 1959, all of the business and operating assets of Old National were transferred to U. M. Investment Co. Old National was dissolved and U. M. Investment Co. changed its name to National Rejectors, Inc., and succeeded to the business of Old National. "Old" National joined as party plaintiff because some of the alleged wrongful conduct of the defendants occurred prior to the 1959 transaction. See § 351.565, RSMo 1959, V.A.M.S. Unless the separate corporate identities are significant, plain-

tiffs will be referred to herein as "National."

The parties defendant are three individuals, Rollyn C. Trieman, Albin S. Pierz and Fred J. Melvin, formerly employees of National, who in 1958 incorporated the defendant Missouri corporation Coin Acceptors, Inc., as Boxer Tool and Engineering Company. Also named as party defendant is The Vendo Company, a Missouri corporation. The individual defendants will be referred to herein by their last names, Coin Acceptors, Inc. as "Coin Acceptors" and The Vendo Company as "Vendo."

The essence of the plaintiff's charge is that the individual defendants, together with other employees of plaintiff, conspired, while in plaintiff's employ to enter the business of designing, manufacturing and selling coin-handling devices in competition with plaintiff; that in furtherance of such conspiracy, the individuals misappropriated plaintiff's trade secrets and caused Coin Acceptors to be incorporated, which, making use of plaintiff's trade secrets, did go into business in competition with plaintiff; that Vendo under a contract with the other defendants made use of plaintiff's misappropriated trade secrets, with knowledge of the other defendants' wrongful acts.

National alleged that its trade secrets consisted of the physical features and characteristics of every part of its slug rejectors and electrical coin changers, including their dimensions, shapes, materials, its "trial and error," "cut-and-try" and experimentation used in the development of its devices.

The trial court found that National was possessed of trade secrets consisting of dimensions, tolerances, shapes, forms, positions, relationships, strengths, and materials used in the design, development and mass production manufacture of slug rejectors and electrical coin changers, together with trial-and-error, cut-and-try, and experimentation. Permanent injunctions were entered against each defendant's designing, manufacturing, using and selling any slug

rejectors or electrical coin changers embodying National's trade secrets; disclosing National's trade secrets to any other persons; using National's trade secrets for their own use or profit; and manufacturing, using and selling Coin Acceptors' slug rejectors and other types of slug rejectors and electrical coin changers being manufactured by Vendo.

The trial court ordered that defendants surrender and deliver to National for its use or destruction all ·drawings, sketches, photographs, memoranda and other writings and all copies thereof, and all tools and dies, used by defendants in the manufacture of the types of slug rejectors and electrical coin changers presently manufactured by Coin Acceptors and Vendo.

There are two classes of coin-handling devices involved in this suit: slug rejectors and electrical coin changers. Such devices are in common use on vending machines which dispense food, cigarettes, soft drinks, etc., amusement machines, such as phonographs, pin balls, etc., and service machines, such as coin-operated washing machines.

There are two general types of slug rejectors: single coin slug rejectors which handle single denomination coins—nickels, dimes and quarters; and multi-coin slug rejectors which handle coins of several denominations. "3-in-1" models handle nickels, dimes and quarters, and "4-in-1" models have added sections for either pennies or half dollars.

National currently produces single coin rejectors, known as its "700 Series." Coin Acceptors' comparable devices were first its "500 Series," later changed to its "50 Series." National calls its 50-cent slug rejectors its "7900 Series," while the comparable device made by Vendo is called its "80 Series." National's 3-in-1 rejector is its "8000 Series," Vendo's its "78 Series." National's 4-in-1 rejector is its "8100 Series," and Vendo's its "79 Series." National's electrical coin changers are its "7600 Series" and "8800 Series," Vendo's being its "90 Series."

The operation of a slug rejector, the purpose of which is to separate genuine coins from slugs, may be described briefly as follows: The coin or slug is deposited in an inlet or "coin insert" at the top. It then encounters a rotating cradle which has legs extending into the coin path. The legs are spaced to receive a coin of proper diameter. Undersized coins fall through to the reject outlet. If the coin or slug is too large in diameter or too light in weight, it remains in the cradle and must be removed by use of the "reject" lever, which operates the scavenger and knockout for such purpose. If the coin is of proper size and weight, its weight causes the cradle to rotate and deposit the coin on an inclined rail.

The coin or slug travels down the rail and in doing so it is tested for thickness. If the coin or slug is of greater thickness than is normal for the coin which the device is designed to test, it cannot pass along the rail and through the space between the magnet and the rejector mainplate. Objects of excessive thickness are halted and operation of the scavenger permits them to fall into the rejected coin path.

In its passage between the magnet and the mainplate, the object is also tested for metallic composition. Legitimate coins are made of nonmagnetic metal. Some slugs are made of magnetic material and will adhere to the face of the magnet and must be removed by the wiper, also operated by the reject lever. Some slugs are also made of nonmagnetic metal. Nonmagnetic slugs and coins generate eddy currents as they pass through the magnetic field. Different materials generate different quantities of eddy currents and the retarding effect of passing through the magnetic field is related to the type of metal involved.

The speed, as affected by the passage through the magnetic field, at which the object leaves the end of the rail determines its trajectory and thereby its final course into either the reject area or into the area where legitimate coinage activates the switch to dispense to the customer a pack

of cigarettes, a bottle of soda, etc., or place the amusement or service device in operation.

Coin changers provide for the return to the customer of the difference between the denomination of coin which he inserts and the charge for the product or service which he purchases. Coins pass first through a slug rejector, and, if accepted, into the changer. In passing into the changer, the coin strikes a switch wire located in the coin chute, activating a switch which starts the motor of the changer. The motor moves a coin pay-out slide which causes the correct amount of change in nickels or dimes to be returned to the customer. Some changers pay out nickels and dimes, others only nickels.

National has successfully engaged in the manufacturing and sale of coin-handling devices since 1935. Its growth is reflected in its 25 employees in 1938 and 800 in 1956. National developed and owned numerous patents relating to slug rejectors and changers. Just before this suit was filed in October, 1960, National had 63 patents relating to coin-handling devices, 27 of which had expired by reason of the 17-year term limited by 35 U.S.C.A. § 154. Since the 1940's, National was the only manufacturer of a complete line of coin-handling devices and until shortly before this lawsuit was commenced, it was practically the sole source of supply for coin-handling devices for the vending machine business. Vendo, a leading manufacturer of vending machines, was a good customer of National for many years. Another subsidiary of Universal Match, National Vendors, Inc., competed with Vendo in the sale of vending machines.

As a part of the 1956 transaction in which the Gottfried stock was sold to the U. M. Investment Co., Gottfried agreed to try to induce National employees to sell their Class B stock to U. M. Investment Co. At Gottfried's request, Trieman and Pierz did sell the 500 shares of Class B stock which each owned to U. M. Invest-

ment Co. After the U. M. Investment acquisition there were changes in the management and operation of National with which some employees, including Trieman, disagreed. Trieman had entered National's employment in 1949 as a degreaser. He learned the theory and function of slug rejectors and coin changers from National's officers and engineers. Eventually he got into sales work for National and in 1957 became sales promotion manager and in 1958 sales manager. Early in 1956, while having lunch with Melvin, Trieman advanced the suggestion that the two of them leave National and engage in their own business.

Melvin, who had an 8th grade education, worked for various employers as an apprentice tool and die maker beginning about 1935. He was employed by National in 1946 as a "board" man in which he did layout drawings of part movements on paper, sketching them for making and assembling models. We do not find what, if any, title Melvin had at the times here relevant. However, he was a member of the National engineering staff and did design work and modelmaking. He claimed to have had something to do with all of National's projects "either by discussion with others working on it or by working on it myself."

Melvin rejected Trieman's suggestion, but the idea persisted with Trieman. A few months later, he and Roy Handing, a National purchasing agent, discussed the idea again without results. In mid-1957, Trieman again approached Melvin on the subject and the two discussed possible enterprises at lunch on several occasions. Although various possibilities were suggested, the one uppermost in their minds was the coin-handling business. Melvin had some ideas about improvements which might be made on the National devices. As their objective became more fixed, they decided to invite Handing and his friend Vaccaro to participate in their discussions.

Vaccaro had been employed by National since 1938. He began as a general laborer,

then became a tool room apprentice, a tool and die maker, and eventually was placed in charge of the tool room and of "farming out" National's tool making. In 1957, he became chief methods engineer at National. Trieman and Melvin were concerned about the cost of getting into the manufacturing of coinage equipment and they sought the assistance of Handing and Vaccaro because of their knowledge of sources of supplies and credit and of the making and purchasing of tools and dies.

Handing and Vaccaro were interested and the four had lunch frequently to discuss their ideas. In October, 1957, they selected a barn, rent free, on a farm in south St. Louis County owned by Trieman's father-in-law as the location of their shop.

Around the first part of November, 1957, the four got together over a week end at Vaccaro's farm and discussed their plans, the adapting of the barn for their needs, the equipment and machinery which would be required for making coin-handling devices and the cost of their undertaking. The four agreed that beginning January, 1958, each would contribute $25 per month to get the enterprise under way. At this outing, questions arose about "security." Apprehension was expressed that, should National learn of the venture, continued employment there would be in jeopardy. The four agreed that Trieman should prepare a document pledging each of the participants to secrecy. Upon their return to St. Louis, Trieman prepared a document reading:

"November 14, 1957

"We the undersigned agree that the purpose of this instrument is to implicate and bind each with the other for the ultimate purpose of starting a coin-handling business together.

"This instrument in no way binds any of the parties listed below to remain with this indeavor [sic] but does serve to reduce the element of risk to exposure, should any or all parties listed below decide to abandon the project."

Each of the four signed copies of the document within a few days after its date and each was given a copy signed by the other participants.

Working nights and week ends the group adapted the barn for use as a shop. A concrete flooring was poured in April, 1958, and a work bench and drafting board installed. Vaccaro brought a bench drill press from his basement shop at home and sometime prior to August, 1958, a Bridgeport milling machine was obtained.

The group discussed several potential products, including a barbecue spit which did not go beyond the talking stage and a timer, a model of which was made but its production was abandoned. There is no doubt that the group from the beginning was concerned with the production of coin-handling devices. Late in 1957, Melvin, working at his home, had designed a 3-in-1 rejector scavenger which employed three cradles. National's 3-in-1 scavenger had only two cradles and complaints had been received about smaller denomination coins being accepted as quarters. Melvin's scavenger was designed to correct this difficulty. Vaccaro, working in his home from Melvin's layout drawings and using a brass plate obtained from National without consent, made a model of the 3-in-1 scavenger. Equipping the model with cradles and cradle pins obtained from National, likewise without consent, the device was inserted in lieu of the original scavenger in a National 3-in-1. The model device appeared to work satisfactorily. However, the group concluded that the cost of tooling for a 3-in-1 unit would be so great that they could not start with such a device. The 3-in-1 unit is also more complicated and Trieman's idea was that the group would do all of the tooling themselves. Therefore, they turned to the designing and production of the simplest slug rejector, the ten-cent single coin unit.

Melvin set out to design a unit as close as possible to the comparable National product. He combined his knowledge of the dimensions of the National ten-cent device

with information obtained from measuring a National rejector at the barn. There was evidence, more fully discussed below, of the use of flat and unformed mainplates brought to the barn by Vaccaro from National's stock. There was some testimony of the use of National's production drawing at the barn. Again the evidence on this subject will be more fully discussed later. There was also evidence that Vaccaro had a magnet bracket die-cast mold filled with molten zinc at National; that he had National's tool room employees cut out the groove and form the rib in the form blocks used to rib the scavenger for the group's product; that he brought metal, cradles, cradle pins, and magnets from National for the group's use.

The group had numerous ideas for improving on the National device, some of which, including the hinging of the magnet bracket, the ribbing of the scavenger, the simpler assembly of the coverplate, were incorporated in the group's final product.

In June, 1958, Pierz became a party to the November 14, 1957 pact. A resident of Chicago, Pierz had been employed by or associated with National since 1943. He had been in charge of the Chicago branch office since 1952. According to Melvin and Vaccaro, the group was anxious to have Pierz join them because of his knowledge of the Chicago market, where 90% of the single coin units were used. Melvin said that he felt that Pierz would be able to sell the group's product to National's Chicago customers.

Although Melvin inferred that Pierz had some prior knowledge of the group's activity before he appeared at the barn on June 13, 1958, and signed the November agreement, both Pierz and Trieman testified that Pierz had no prior knowledge of the operation until he went to the barn with Trieman on June 13, after expressing disgust with the failure of National's management committee to approve Pierz' idea for a product which Pierz presented to them. Pierz joined in the $25 monthly contribu-

tion, retroactively to January. However, since his office was in Chicago, he did not participate in the activity at the barn or at the second shop.

In October, 1958, the group organized the "Boxer Tool and Engineering Corporation." Dummy incorporators were used and Melvin's wife used her maiden name as an officer of the corporation. According to Melvin, the group sought to avoid National's knowledge of the identity of the actual incorporators from publication in the St. Louis Daily Record. The group felt that the name selected for the corporation would not, in any event, arouse suspicion regarding their ultimate goal.

In addition to working on their own device at the barn, the group did some work for National, without the latter's knowledge. Handing and Vaccaro were in charge of farming out the making of parts for National. Vaccaro suggested to Handing that they arrange with Elliot Tool Company to farm out a job to them with the understanding that the work would be performed by the group. Handing brought the plans for the job to the barn, which plans did not involve any devices here in question, and the group did the work. The billing for the work was done by Elliot, which, on November 21, 1958, turned over to the group the $1,201.04 received from National for the job. Other than the monthly contributions by the group, the enterprise had no other income during 1958.

To avoid another winter at the barn, space for a shop was rented on Olive Street Road in December, 1958, for $60 per month. At the time of the move to the new location, a rough model of a ten-cent rejector had been completed. The machinery used at the barn was brought to the new location, and additional items of equipment were acquired, including a lathe, a surface grinder and a filing machine.

Early in 1959, while Trieman was talking with Merral T. Haverstick, a National project engineer, Haverstick expressed dissatisfaction with his job. He was invited

to visit the Olive Street shop. Haverstick had been employed by National since 1940, except for a period of military service. He first worked at various jobs and in 1946 or 1947 was assigned to the engineering department, doing experimental work. He continued such work until he left National in September, 1959. He was the project engineer for the development of numerous National rejectors and did design work on changers.

Haverstick went to the Olive Street shop on three occasions in February, 1959, and did some work on the slug coverplate for the ten-cent unit. He did not finish the job and after the third visit told Handing that he was not interested in joining the group.

On March 15, 1959, Melvin resigned his position at National to work full time for Boxer at a salary of $10,000 per year. When Melvin told Mr. John Gottfried, National's President, and Mr. Fred Wallin, National's Vice-President, that he was leaving, he said that he was going to work with Cavic Engineering Company. For about two weeks, Melvin, pursuant to an arrangement with Cavic owners, went to the Cavic office a short time daily. Some six weeks after Melvin left National Rejectors, Wallin called for him at Cavic. Cavic employees got in touch with Melvin, who called Wallin. Wallin, acting on Vaccaro's suggestion, wanted Melvin to do some experimental work on a change making device of National. Melvin came to Wallin's office where the project was outlined to him. A bid was submitted by Cavic and the job was awarded to them. The work, which was actually done by the Boxer group, did not involve a device which is the subject of this litigation. National paid Cavic for the work. The payment was divided between Cavic and Boxer, the latter receiving approximately $2,000.00.

At around the time Melvin started working full time at Boxer, other National employees became involved in the Boxer operation, by part-time work at the shop and the purchase of Class B stock. The Class A voting stock of Boxer was issued to the five original venturers, in return for their $25 ($50 for two months) monthly contributions which ended in December, 1958. Thereafter, until the Vendo contract in October, 1959, the sale of Class B non-voting stock was the principal source of Boxer's income.

In March, 1959, Norm Burzen, an account executive, in charge of National's sales of electrical products, cup dispensers, accumulators and timer housings, expressed to Trieman dissatisfaction with his employment. Burzen had worked for National Rejectors since 1954. Trieman told Burzen about the Boxer enterprise. Burzen was interested in the project and, on March 15, 1959, purchased four shares of Class B stock. He went to the Olive Street shop on four or five occasions at night and on week ends, assisting in setting up machinery and working on the job Boxer did for National through Cavic.

At around the same time, Baptiste J. Randazzo, William R. Sabol and Joseph J. Giamanco purchased Class B stock. Randazzo was a foreman on the slug rejector testing line at National. He worked part time at the Olive Street shop for about two months. Giamanco was a general foreman over National's coin changer production line. He worked evenings and some Saturdays and Sundays at Olive Street. Sabol was "either in sales or service." He worked part time on Olive Street and eventually withdrew from the Boxer operation in October, 1959.

On March 11, 1959, Trieman, in his capacity as National's sales manager, called a sales meeting of the National branch managers in St. Louis for April 3 and 4, 1959. Trieman had discussed with the Boxer group the possibility of interesting some sales managers in buying Class B stock. Trieman invited a number of the branch managers to a meeting at the Bel Air Motel the night before the regular meeting: Trieman, Vaccaro, Melvin and Pierz attended, along with several branch managers. According to Melvin, some

managers were not invited because they couldn't be trusted. Trieman explained the Boxer setup and endeavored to interest those present in the purchase of stock. Some expressed an interest and several accepted Trieman's invitation to visit the shop. None invested at that time, although Robert E. Smith did so in August, 1959.

At a meeting with his Boxer associates before the sales meeting, Trieman berated Handing and Vaccaro for fishing while he and Melvin were working at the shop. Handing took offense, left, and had no further connection with the Boxer group. Vaccaro, also offended, stayed a while longer, leaving Boxer shortly after the Bel Air meeting. Both Handing and Vaccaro continued their employment at National Rejectors, although Handing was not employed there at the time of the trial. Vaccaro testified as a witness for National. Handing did not testify.

On March 26, 1959, Boxer hired a full-time draftsman, Earl Pickett. Pickett began work on production drawings for the Boxer ten-cent rejector and many of the drawings for that unit are dated shortly afterwards. Work also began on the tools and dies required for the production of the ten-cent unit. Melvin and Vaccaro did the major portion of such work.

Melvin also began working on layout drawings for a 3-in-1 rejector, using a National device which he measured and "two or three" National production drawings. Work was also done on the design of nickel and quarter single coin units, which were largely based upon the ten-cent device.

In June, 1959, the tempo of activity at Boxer increased. Abandoning the original idea of making their own tools and dies, orders were placed with St. Louis tool-making companies for dies for various parts of the ten-cent unit. The first order was placed around June 13, 1959. A punch press was purchased and orders placed for parts, such as magnets, screws, springs, etc.

On June 24, 1959, Trieman was at the Vendo office in Kansas City, on National business. At that time, he told Mr. Spencer Childers, Vendo's vice-president in charge of operations, that he and Melvin were going into business for themselves. (The details of the negotiations with Vendo which ensued will be fully dealt with in considering the question of Vendo's liability.) Larger quarters were required for the operation and on July 4, 1959, Boxer moved its shop to 1711 Hereford Street in St. Louis into a building rented for $600 per month.

Shortly after the move to Hereford Street, Trieman resigned his position at National. National's records showed the date of the termination of his employment as July 31, 1959. Trieman told Mr. Gottfried that he and Melvin were going into the consulting business.

Trieman was aware that a basic National rejector patent, the so-called "Fry Patent," would expire on August 11, 1959, and that the Boxer ten-cent device could thereafter be sold. When Childers visited the Hereford Street plant on July 10, he observed some women working in the plant on sub-assemblies for preliminary models of a single coin rejector. By late summer, models of the unit were being produced "off the tools." After the August 18th meeting with Melvin, Pierz and Childers in Chicago, Trieman remained in Chicago and got in touch with several potential customers for the ten-cent device. Samples of the device were left with five concerns, including the Gottlieb Company. Trieman subsequently returned to Chicago and again visited these concerns. On August 26, the Gottlieb Company ordered from Boxer 200 ten-cent devices. The order was filled, Boxer's invoice for $495.00 being dated September 14, 1959.

On September 14, 1959, the Boxer shareholders adopted a resolution to change the name of the corporation to Coin Acceptors, Inc., and to reduce the number of directors from five to three. On the same date, the board of directors met and accepted the resignation of dummy officers of the cor-

poration and elected Trieman president, Melvin vice-president and Mervyn Goodman secretary-treasurer. The dummy directors resigned by September 30 and on that date Trieman, Melvin and Pierz were elected directors of what was by then Coin Acceptors, Inc.

Goodman had been employed by National since 1955, doing accounting work. He resigned his position at National on July 17, 1959, effective August 14, 1959, without knowledge of Boxer's existence. He talked to Trieman on July 20, in connection with obtaining a recommendation from Trieman. A few days later, Trieman offered him a job at Boxer, which he finally accepted after seeking work elsewhere. He began working for Boxer on September 1, 1959, taking over Melvin's bookkeeping duties.

Haverstick came to Boxer to work full time, beginning September 22, 1959. After the work he had done in February, Haverstick was asked by Trieman to join the group. Haverstick said that he might be interested if they could offer him a full-time paid job. According to Haverstick, he had no further contact with the group until after his resignation from National Rejectors in August, 1959. He testified that he had a great many complaints about his situation at National Rejectors which eventually led to his resignation. After he had resigned, Trieman got in touch with him and offered him a job at Boxer, which he ultimately accepted.

Joseph F. Lotspeich (referred to as Lotspeich, Senior) went to work for Boxer on September 23, 1959. He had been employed by National Rejectors since March 15, 1954. He was a tool and die maker. He testified that he resigned at National Rejectors because of his dissatisfaction over the size of a salary increase. Melvin got in touch with him on the day after he re-

signed and offered him a job at Boxer. After a few days' consideration, he accepted the offer.

Negotiations between Coin Acceptors and Vendo produced an agreement, dated October 1, 1959, whereby Coin Acceptors undertook to do, as requested by Vendo, design, development and engineering work relating to coin changing and handling devices. At the time of the signing of the contract, Vendo paid Coin Acceptors $16,000 on account of work to that date on a 3-in-1 rejector. Subsequently prepared detailed statement of time spent on the project, the basis of Vendo's payments, showed that beginning March 23, 1959, to September 30, 1959, Melvin had spent 636 hours on the 3-in-1 as chief and project engineer; Pickett, from April 1, 852 hours; Haverstick and Lotspeich, as project engineers, 5 and 24 hours, respectively, in September.

After the Vendo agreement, Coin Acceptors continued to work on the 3-in-1 rejector and Vendo also authorized work on a ten-cent electrical changer, a fifty-cent rejector and a dual rejector, among other projects. Detailed drawings for the 3-in-1 had been completed by the first part of December, a model was thereafter constructed, and tooling for the device was authorized by Vendo on February 4, 1960. By October, 1960, total payment by Vendo to Coin Acceptors amounted to approximately $209,000.00.

Under the Vendo contract, Vendo produced multiple coin rejectors and changers. Coin Acceptors retained the right to produce single coin units and ordered tooling for five-cent and twenty-five-cent units between September and November, 1959. Coin Acceptors manufactured these items, in addition to the ten-cent unit. Coin Acceptors' production and sales of single coin devices between October 1, 1959 and December 31, 1961, were as follows:

| Unit | Manufactured | Sold | Gross Sales Price |
|------|--------------|------|-------------------|
| 5¢ | 32,441 | 31,111 | $ 77,513.90 |
| 10¢ | 78,409 | 77,061 | 192,789.85 |
| 25¢ | 51,632 | 42,178 | 105,778.44. |

During the same period, Vendo manufactured 60,125 3-in-1 rejectors, 6,611 fifty-cent channel assemblies, and 34,905 changers. Under the Vendo-Coin Acceptors contract, Vendo produced these devices for use in its own products and also sold them to Coin Acceptors for sale to the vending machine industry. Vendo used 41,050 3-in-1 rejectors, 71 fifty-cent channel assemblies and 28,468 changers. The balance of its production was sold to Coin Acceptors at a total price of approximately $315,601.00.

In either late August or early September, 1959, Trieman had dinner with John Gottfried, president of National. At that time, Trieman told Gottfried that he had lied when, on leaving National Rejectors, he stated that he was going into the consulting business. He told Gottfried that he had left to go into the coin-handling business in competition with National. He told Gottfried of Melvin's and Goodman's participation in the venture and that others at National were interested in joining with them. According to Trieman, who offered the only testimony on the meeting, Gottfried was friendly and did not remonstrate with him. A short time later, Trieman had lunch with George N. Keuchler, then secretary-treasurer of National Rejectors. He told Keuchler of the entire arrangement and invited him to join Coin Acceptors. Keuchler declined, telling Trieman that he was undertaking too expensive an operation without adequate financial backing. In neither of these discussions was any connection with Vendo mentioned.

Other National employees did go to work for Coin Acceptors. Joseph A. Lotspeich (referred to as Lotspeich, Junior), the son of Joseph F. Lotspeich, went to work for Coin Acceptors on October 16, 1959. He had worked for National Rejectors since July 1, 1955, as a draftsman. He testified that, on September 30, 1959, he saw a Coin Acceptors' newspaper advertisement offering employment. He tendered his verbal resignation on October 1, effective October 15. No one at Coin Acceptors had asked him to join that organization.

Pierz first discussed resigning from National in 1958. He was dissuaded by Wallin from doing so. In September, 1959, in Chicago, he told Ray Gottfried of National that he was going to resign. His letter of resignation was dated October 14, 1959, effective November 15. With vacation accrued, Pierz last worked for National Rejectors on November 2, 1959. On December 1, 1959, he began work for Coin Acceptors as manager of its Chicago branch office.

Burzen left National and became Sales Manager at Coin Acceptors on October 13, 1959. Giamanco came to work at Coin Acceptors in July or August, 1959. John Neimeyer and Joseph Van Middlesworth, draftsmen, left National and started working at Coin Acceptors on October 16 and November 2, 1959, respectively. Leonard Kornfeld resigned as assistant manager of National's New York office to become manager of Coin Acceptors' New York branch on January 15, 1960. Robert E. Smith, formerly National's Los Angeles branch manager, resigned that position when he learned that he was to be fired by National and accepted a job as Coin Acceptors' Los Angeles branch manager on August 8, 1960. James Moran resigned his job as production line foreman at National in September, 1960, and started working for Coin Acceptors on October 7, 1960, and was customer service manager at the time of his testimony. Edwin Gaetz resigned as manager of National's New York branch office effective January 30, 1960. He sought employment by Coin Acceptors in March, 1960, and, in May, 1960, was employed by Coin Acceptors, becoming manager of its Houston branch in June, 1960. Chester Victor resigned as assistant to the production control manager at National on September 15, 1960, and on October 1, he started to work for Coin Acceptors as its production control man and purchasing agent. Robert Chagnon, an employee in National's electrical laboratory, left National on June 15, 1960, and, on July 15, 1960, went to work for Coin Acceptors.

Dissension began to arise between Trieman and Melvin at least as far back as the middle of 1959. Melvin and Trieman had a dispute about Goodman's salary when the latter was employed to take over Melvin's bookkeeping duties. Melvin disliked the Vendo contract in general and began considering leaving Coin Acceptors. Disputes between Melvin and Trieman became frequent and sometimes heated. They got into an argument in the presence of Andrews of Vendo. In February, 1960, a proposal was presented to Melvin, Trieman and Pierz as the Class A stockholders of Coin Acceptors for a limitation upon the sale of such shares for a term of five years. Melvin opposed the proposal, but Trieman and Pierz outvoted him at a stockholders' meeting held February 27, 1960. Melvin stated that he "felt everybody was against me" so he said: "Fellows, if you feel I am going out and sell my stock to a competitor, I will sell it to you right now." The offer was accepted and Melvin received $7,000 for his 183 shares. He left Coin Acceptors April 9, 1960.

When Andrews of Vendo learned of Melvin's departure, he stated, in a memo to another Vendo official: "This could develop into a rather unfortunate situation in the event of litigation with National Rejectors."

Within a month after leaving Coin Acceptors, Melvin got in touch with Wallin of National, seeking employment. At a series of meetings with Wallin, other National officials and attorneys, Melvin revealed the details of the Coin Acceptors operation. On October 12, 1960, he gave a detailed, formal statement to National Rejectors' attorney, Mr. Marshall. This suit was filed October 26, 1960.

Wallin arranged a meeting between Melvin and Holstein, the chief engineer of National Vendors, a subsidiary of Universal Match. Melvin's employment by National Vendors was discussed. In June, 1960, Melvin set up an engineering shop at premises leased by him. On July 7, 1960,

Melvin entered into an agreement to perform engineering services for National Vendors. At first the operation was a one-man shop, but Melvin employed Pickett, the former Coin Acceptors draftsman, in August, 1960. Thereafter, he also employed Pickett's father and brother. The enterprise was incorporated in August, 1960, as "Melvin Engineering Company" and a new contract was entered into between the corporation and National Vendors. Melvin Engineering engaged exclusively in work for National Vendors. The number of employees increased to seven in June, 1961, including Joseph Giamanco, the former National Rejectors and Coin Acceptors employee, and a nephew of Melvin's wife. Melvin's salary, as president of the corporation, was $15,000 per year. His deposition in this case was taken around Labor Day, 1961. He thereafter received one work order from National Vendors. All of his work for them was completed by December 28, 1961. Melvin sold his machinery and got out of business. He received approximately $180,000 from Universal Match and National Vendors (one billing was paid by National Rejectors) under his contract. However, Melvin was not satisfied that he had received all that he should have. "(S)o much money went into this project, that it was my opinion that 10 or 12 thousand dollars more would not have hurt them, and it could have saved my business." The only business which was offered him by Universal Match after December, 1961, was the manufacturing of some dies within what Melvin considered to be an impossibly short time, so he turned down the job. At the time of his testimony, he stated that he was unemployed.

Trial of the case began April 9, 1962, and concluded March 14, 1963. The trial consumed 120 court days during which nearly 18,000 pages of testimony were taken and over 2,000 exhibits offered in evidence. The trial judge's opinion and decree were filed October 17, 1963, and, after the defendants' 866 pages of after-trial motions were overruled, this appeal followed.

The petition, naming National's coin-handling devices as five-cent, ten-cent and twenty-five-cent slug rejectors, 3-in-1 slug rejectors, 4-in-1 slug rejectors and coin changers, alleged that its devices had been sold for many years throughout the United States and various other countries and had gained wide public acceptance as the most efficient on the market. The petition alleged: "The quality of plaintiff's coin devices has been maintained and improved by research and development conducted by plaintiff over the years at great expense. This research and development have resulted in the discovery and perfection by plaintiff of designs, features and methods of manufacture, which have enabled plaintiff to manufacture its devices with a greater degree of accuracy, with a lesser degree of tolerance and with a greater efficiency than similar devices manufactured by plaintiff's competitors." The petition alleged that these designs, features and manufacturing methods are property rights of National and that their perfection has been the product of many years of painstaking, extensive experimentation and trial and error on plaintiff's part and investment by it of many thousands of dollars. The petition alleged: "Hereafter in this petition the term 'trade secret' is used to describe a design, feature or manufacturing method which is the property of and which was developed by plaintiff as hereinabove set forth."

The defendants by interrogatories sought to compel National to enumerate specifically the nature, scope and subject matter of each and every trade secret claimed to have been misappropriated by defendants. See Package Machinery v. Hayssen Mfg. Co. (E.D., Wisc.), 164 F.Supp. 904, affirmed 7th Cir., 266 F.2d 56; Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 213 A.2d 769, 775–776 [12]. In answer to the interrogatories, National's vice-president, Fred E. A. Wallin, described its trade secrets with respect to each of its 700 Series single coin rejectors, its 4900 and 8200 3-in-1 and 4-in-1 rejectors, its fifty-cent rejectors

and its coin changers. With respect to each of the devices the answers listed: "(a) The metal alloys used in fabricating or manufacturing each and every part thereof. (b) The dimensions and tolerances of each and every part thereof. (c) The positions, shapes, strengths, dimensions and relationships of the following parts one to the other: * * *." There followed a listing of 16 items with respect to each of the single coin rejectors, 47 items with respect to the 3-in-1 and 4-in-1 rejectors, 23 items with respect to the fifty-cent rejectors and 11 items with respect to the changers. Subsequent answers by Wallin to defendants' further interrogatories described the claimed trade secrets with respect to each type of device involved as follows: "*5¢ slug rejectors.* The experiments, research and trial and error, experimental, working and production models, and drawings resulting in or relating to: (a) The metal alloys used in fabricating or manufacturing each and every part thereof. (b) The shapes, strengths, dimensions and tolerances of each and every part thereof. (c) The tools and dies used in fabricating or manufacturing each and every part thereof. (d) The methods or devices by which the several parts are attached or connected one to another. (e) The methods and devices by which the rejectors are tested. (f) The positions, shapes, strengths, dimensions and relationships of the following parts one to the other: * * *." There followed the same enumeration with respect to each of the devices found in the original answers to interrogatories.

The defendants were not satisfied with the definition of National's trade secrets and moved to compel further answers to the interrogatories. National offered to make available to the defendants all of their devices, blueprints and drawings which, according to National, would exhibit their trade secrets. The parties agreed to this proposal, and National produced a total of 265 devices and 6,160 blueprints for examination. Over the objection of the defendants that National still had not specified

**18**

the matters claimed as trade secrets, the case proceeded to trial. At the trial National's vice-president, Wallin, whom National's interrogatories had identified as one of the two persons having the greatest personal knowledge of National's trade secrets, was asked by the court, "What is your trade secret?" Wallin replied, "The trade secrets would be on the over-all unit, the various parts and its dimensions and tolerances." When asked by National's counsel of what the trade secrets consist, Wallin stated: "Of the material, dimensions, shapes, forms, tolerances, the various relationships of parts one to another in the unit, which all have resulted from experimentation and cut and try methods and have resulted in these problems."

The trial court in its findings of fact found "that plaintiffs' trade secrets consist of the dimensions and tolerances, shapes and forms, positions and relationships, strengths and the materials used in the design, development and mass production manufacture of plaintiffs' slug rejectors and electrical coin changers, together with the trial and error, cut and try and experimentation which went into their determination by plaintiffs." The trial court's conclusions of law contain a similar finding. The trial court's decree, among other things, enjoined the defendants from designing, manufacturing, using and selling slug rejectors or coin acceptors embodying plaintiffs' trade secrets; enjoined the defendants from disclosing plaintiffs' trade secrets for their own use or profit in any manner whatsoever.

On this appeal the appellants contend, among other things, that the trial court's decree should be reversed because National failed to prove that it had any real trade secrets entitled to protection.

National on this appeal points out that the trial court recognized that the existence of trade secrets was the most important controverted issue in the case. National apparently concurs with the trial court's remark on final argument: "The main issue

this Court is going to have to decide in this case, is whether or not there were trade secrets." National contends that the trial court properly resolved the issue in its favor.

■ In view of the broad nature of National's claim of trade secrets, we, at the outset, note that National disavows any claim to trade secrets in the following:

1. The principles of the slug rejectors and coin changers which are disclosed in the United States patents.

2. The dimensions, tolerances and other information disclosed on mounting drawings which are sent to National's customers. (The trial court's decree makes no exception to the dimensions and tolerances which it found to be among National's trade secrets. National's disclaimer of certain of such items as trade secrets poses a considerable problem in specificity of the injunctive decree. Cases in this state point out the necessity that an injunction clearly and specifically describe the acts and things enjoined. Commission Row Club v. Lambert, Mo.App., 161 S.W.2d 732; Magel v. Gruetli Benev. Soc. of St. Louis, 203 Mo. App. 335, 218 S.W. 704.)

■ With these matters eliminated from our consideration, we examine National's claim in the light of the definition of trade secrets found in the Restatement of Torts, § 757. The Restatement definition has been described as seeming "in general * * * to represent the consensus." Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 213 A.2d 769, 775, f. n. 4. While recognizing that exact definition of the term is not possible, that work undertakes to do so as follows:

"b. *Definition of trade secret.* A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating

or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business (see § 759) in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

*"Secrecy.* The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

See Reddi-Wip, Inc. v. Lemay Valve Company, Mo.App., 354 S.W.2d 913; Ultra-Life Laboratories v. Eames, 240 Mo.App. 851, 221 S.W.2d 224, 232; 2 Callmann, Unfair Competition & Trade Marks (2d ed.), §§ 51–53, pp. 780–815.

Considering the claims here advanced by National, we readily conclude that many of them do not relate to trade secrets as defined by the Restatement. The devices involved are not mechanically complicated. The single coin rejector, for example, may be readily disassembled by the use of a screwdriver. Apart from screws, springs and other attachment devices, it is composed of less than twenty parts. No effort is made to conceal any of the parts of the finished product. Its component parts are easily discernible. The shapes and forms of the component parts are quite apparent. The same may be said of the general positions and relationships of the parts. See Skoog v. McCray Refrigerator Co. (7th Cir.), 211 F.2d 254. Wallin acknowledged that the parts are not made from secret alloys or materials discovered by National. He acknowledged, for example, that any person with general industrial knowledge could ascertain that the mainplate was constructed from chromium plated steel. Witnesses agreed that the materials used in all of National's devices were generally apparent upon inspection of the devices.

Although the multiple coin rejectors and the changers are more complex than the single coin rejectors, they are yet not such complicated devices that what was said

about the shapes and forms, positions and relationships and materials of the single coin units is not equally applicable to the multiple coin rejectors and the changers. The shapes and forms of the parts, as well as their positions and relationships, were all publicized in National's patents as well as in catalogs and brochures and service and repair manuals distributed to National's customers and the trade generally.

National would, however, dispense with the traditional requirement of secrecy regarding such matters and have them considered trade secrets because they were the product of many years of trial and error, cut and try and experimentation conducted by National. We have no doubt that much trial and error, cut and try and experimentation did go into the final National products. Wallin testified, for example, that numerous tests and experiments had been made of various materials for the rejector mainplates. As above stated, the mainplate of the current ten-cent rejector of National was made of chromium plated sheet steel. Experiments had been conducted with the use of brass, sheet zinc, plastics and stainless steel. The current 3-in-1 rejector had a zinc die cast mainplate with an epoxy coating. Experiments had been conducted with various other types of paint and coatings. Likewise, Wallin identified numerous devices on which varying shapes and locations of the cradle or cradles were to be found. He testified to work that had been done with the material for the rails, the method of attaching the rail to the device and the length and angle of the rail. According to Wallin, National had some 3000 files of the various experiments relating to their products.

■ However, insofar as National's final publicly distributed products are concerned, they are the end result of all of the prior trial and error, cut and try and experimentation. Although the Restatement points out that the amount of effort or money expended in developing information is a matter to be considered in deter-

mining whether it is a trade secret, that element alone cannot convert otherwise obvious shapes and forms, positions and relationships and materials into trade secrets.

Exact shapes and forms, as well as positions and relationships and strength of materials (other than magnets) are, of course, inextricably related to the further category of trade secrets found by the trial court, i. e., dimensions and tolerances. According to National, the only source of precise information regarding dimensions and tolerances was its production drawing or the blueprint produced therefrom. National acknowledges that the marketed devices can be measured by one skilled in measurement. According to some of National's witnesses, such measurement, by a skilled person given enough time, could provide the dimensions of the measured device and its parts to within one ten thousandth of an inch. Wallin testified that the rejectors could be taken apart simply and the parts measured by a skilled mechanic who could make drawings from which a skilled modelmaker could produce a handmade prototype. However, he had no idea whether the device would operate or not—"There are so many things that are involved here." Vaccaro testified that measurement could not provide original dimensions because of tolerance factors. Melvin testified that his general mechanical experience and know-how, apart from the knowledge and experience gained through his employment by National, would have permitted him to have duplicated its 3-in-1 rejector from measurements and examination. National's expert witness, Fischer, expressed the opinion that three men, having general mechanical skill but no experience with the particular devices, could duplicate National's 3-in-1 rejector to the extent of making an operable, handmade model, in about 4 to 6 months. Such persons could accomplish a similar result with the penny section of the 4-in-1 in about two weeks; with the fifty-cent rejector upper section in about one month and

with the fifty-cent main channel in about three weeks. Vendo's expert witness, Clarence Fishleigh, expressed the opinion that National's 3-in-1 could be duplicated by measurement and placed in mass production by a modest-sized, good engineering force in from 6 to 12 months. Fischer was of the opinion that tolerances would have to be established by "considerable cut and try" work before mass production based upon measurement could be undertaken.

Testimony concerning tolerances, the method of establishing them and their significance, occupies hundreds of pages of the transcript. A tolerance is the measure of variation permitted from a basic dimension for a part of a mechanical device. Mass production processes, involving the production of hundreds of thousands of parts from tools and dies, require standards to limit the variation in the dimension of individual parts. Production of each part to exact dimension is not required, but too wide a variation would affect the quality and eventually the operability of the final product.

To provide this range of variation, tolerances are fixed, for the products here involved, on the production drawings for each part of the device. The drawings of both National and Coin Acceptors contain a title block which, among other information, shows the general tolerances for all dimensions and angles shown on the drawing. These so-called "title-block tolerances" are generally identical for every drawing for each part. The majority of National's drawings expressed such tolerances as follows:

"Tolerances

Unless otherwise specified
Fractions ± .010 Decimals ± .002
Angular ± ¼°."

On some of National's more recent drawings, the decimal tolerance was plus or minus .005. Both Coin Acceptors and Vendo employed a standard decimal tolerance of plus or minus .005.

As the standard tolerances indicate, an engineer or draftsman, in designing and drawing a part, can invoke a closer tolerance by expressing the dimensions in decimals, rather than fractions. For example, using National's title block tolerances, if a dimension is expressed as 1½ inches, a part on which the measurement was 1.490 or 1.510 or anything between those figures would be acceptable. If, however, the same dimension should be expressed as 1.-500, the part must be produced with the particular measurement in a range, on National's .002 standard, of 1.498 and 1.-502.

In some instances, the standard or title block tolerances are not acceptable. In such case, the draftsman or designer denominates the tolerance to be applied at the dimension found on the drawing. Such so-called "special tolerances" are applied when one part must fit or mate with another, such as a pin into a hole.

According to National's witnesses, the special tolerances shown on National's drawings were the products of extensive trial and error, cut and try and experimentation. They stated that they could not be determined by any mathematical or scientific formula. Nor could they be determined by measurement of the final product. They also testified that, because tolerances were involved, measurement would not reveal the basic dimensions. Vaccaro pointed out that a person making measurement would not know whether the figure which he found was on the plus or minus side insofar as tolerances are concerned. If one part measured is at the extreme of a plus tolerance and another part with which it must fit is at the extreme of a minus tolerance, and the tool maker adds tolerances to the dimensions revealed by his measurement, it is possible that the product would not work because it would not be of the basic dimensions called for by the designer.

Fischer testified that a handmade duplicate of National's 3-in-1 rejector would not

work because, without knowledge of the tolerances which had been fixed through trial and error, the workmen would not know which tolerance had to be kept close and which could be relaxed somewhat. For the feasible mass production of such device, tolerances would either have to be determined through experience and protracted trial and error, or obtained from National's drawings.

The testimony of the defendants' witnesses, including Dr. Alexander S. Langsdorf, former Dean of Washington University School of Engineering, and Clarence T. Fishleigh, tended to show that operable duplicates of National's devices could be mass produced without knowledge of its tolerances, general or special. Defendants' evidence was that tolerances are in many instances determined according to the recommendations of standard engineers' and mechanics' handbooks and that the proper tolerances to permit successful duplication of National's product on a mass production basis could be routinely selected.

 In any event, the fact that National's tolerances were the product of experimentation, cut and try, and trial and error and that knowledge of them was essential to mass production of its devices would not be sufficient to cause them to be considered trade secrets. As the Restatement points out, trade secrets must be, in fact, secret. See Mycalex Corp. of America v. Pemco Corp., D.C., Md., 64 F.Supp. 420, 425. Steps taken by the claimant to guard the secrecy of the information are significant. Assuming, as National contends, that the dimensions and tolerances of its devices cannot be obtained by measurement and can be obtained only from its drawings or by drawing upon the knowledge of persons who had worked for Na-

tional, we must consider further facts which bear upon the protectibility of such information as trade secrets. The trial court concluded that National had "taken all reasonable steps to keep secret and confidential [their] trade secrets and they have not been publicly disclosed."

According to the Restatement, supra, one of the criteria of trade secrets is "the extent of measures taken by [the claimant] to guard the secrecy of the information; * * *." We fail to find evidence that National took any steps at its plant to keep secret and confidential the matters now asserted as trade secrets. Its engineers and other personnel were not called upon to sign agreements not to compete with National. National employees were not told that anything about National's marketed products was regarded as secret or confidential. On the final argument, the trial court remarked: "There is no doubt that plaintiff was very, very careless in not binding these employees to contracts, *or at least advising them that trade secrets did exist.*" (Emphasis supplied.)

The only evidence of security measures to preserve secrecy of information at National's plant related to isolated, remote incidents. Locks were placed on the door of the engineering department on two occasions, and persons seeking admission had to press a buzzer. Such practice was adopted in 1949 to keep a discharged employee from continuing to "roam around" the plant. Later, a chief engineer employed such method of conserving his engineer's time by limiting access to the engineering department. In each instance, the policy was eventually discontinued.[1]

The only evidence that showed any limitation on the public exhibition of National's products related to unmarketed products

---

1. Contrast National's lack of plant security with the measures undertaken by successful claimants of trade secrets in Space Aero Products Co. v. R. E. Darling Co., 238 Md. 93, 208 A.2d 74, 82, 699; Sun Dial Corp. v. Rideout, 16 N.J. 252, 108 A.2d 442; in Winston Research Corp. v. Minnesota Min. & Mfg. Co. (9th Cir.), 350 F.2d 134, the efforts of the claimant "to maintain the secrecy of its development program" were characterized as "elaborate." 350 F.2d 140 [3].

and the paper currency tester. Melvin testified that, at certain trade meetings where National's products were displayed, he was instructed to display certain unmarketed products only to a limited number of persons and in some instances was told even as to them to conceal the operating mechanism of the device.

The paper currency tester is not involved in this case, but National's handling of it has significance in connection with its claim of secrecy regarding the products here involved. National makes paper currency testers which it does not sell. They are distributed under special lease arrangements and are sometimes used in vending machines under the control of Universal Match Corporation, plaintiff's parent corporation. Some of the operating parts of the currency tester are housed in sealed metal containers and are not open to the user or to the public. Contrary to its practice with respect to the rejectors and changers here involved, National has not described its currency tester in its publications or trade literature. National informed the engineers working on that currency testing unit that information regarding it should be kept secret. The prototype model of the machine was kept in a private office which was locked when the engineer in charge of the project left the room. Management told department heads to stay out of the area where the currency tester was kept and to keep employees not actually working on the product away. The sales department was told not to take visitors to that area of the plant. Visitors were frequently taken through the portions of the plant in which rejectors and changers are made.

As above mentioned, National now concedes that tolerances and dimensions shown on its so-called "mounting drawings" are not trade secrets. Mounting drawings illustrate the exterior of the assembled device. They show the dimensions necessary to permit a purchaser to mount or install the rejector or changer in a coin-operated vending, service, or amusement machine.

A second category of drawings involved in this case is the detailed engineering production drawings. These drawings show dimensions, tolerances and materials for each individual part of each device. Both mounting and engineering production drawings bear title blocks showing title block tolerances. However, in many instances it appears that dimensions shown in decimals on the detailed drawing are given in fractions on the mounting drawings which would cause different tolerances to apply.

Wallin testified that he had instructed employees in the engineering department that the detailed production drawings should not be made available to National's customers. He acknowledged, however, that he did not know whether such instructions had been adhered to inasmuch as if such drawings were distributed to customers, it would be done by the sales department which was not under his control. National offered no witnesses who testified about the actual practice of its sales department. The defendants' witnesses, Burzen, Kornfeld, Smith and Pierz, testified that, without limitation, they procured drawings from plaintiff for use by customers. Trieman testified that the engineering department never turned down his request for a drawing. He stated there were so many times that drawings were sent out that he could not recall specific incidents. Evidence was presented by defendants that a number of National's detailed drawings were sent to National's customers. A detailed drawing of the slug coverplate for the Series 8000 3-in-1 rejector was sent to Seeburg in Chicago. Likewise National's sales department sent Seeburg a detailed print of the main scavenger or gate for the 3-in-1 rejector. National sent Vendo a detailed drawing of the mainplate for its 4900 Series rejector. Trieman testified that he sent the Vendorlator Company, a subsidiary of Vendo, a detailed print of the mainplate of National's 3-in-1 rejector in November, 1950. There was evidence also that National's detailed drawing of the five-cent and twenty-five-cent wiper blade

had been sent to Vendo as well as of the slug cover chute. Detailed drawings of the mainplate and main channel for the fifty-cent slug rejector were sent to Seeburg as well as a detailed drawing of the special penny baffle and the coin insert. Seeburg also had in its files a drawing of National's five-cent coin chute, five-cent cover chute and the push bar rivet.

Vaccaro testified that, during the time he was in charge of farming out National's tool making, production drawings were sent to prospective bidders who might be interested in making the tool for the part in question. According to Vaccaro, National paid no attention to whether or not these drawings were ever returned.

There was no evidence that on either drawings sent to tool makers or to customers, whether mounting or detailed, there was any indication of any limitation by National upon the use of the information contained in the drawing. Wallin took the position that insofar as customers were concerned the relationship with National was a confidential one which would effectively limit the customer's use of any information whether or not the customer was expressly so advised. On this appeal, however, no exception has been taken to defendants' admitted use of National's drawings obtained from its customers.

■ It is our conclusion that National presented no evidence that prior to this litigation it treated information relative to the matters now claimed as trade secrets to be such. In our opinion the obviousness in the finished product of many of the matters now claimed as trade secrets precludes their being such. Shapes and forms and relationships of the parts are in this category. Insofar as dimensions and tol-

erances are concerned, National, which had the burden of establishing that it had protectible trade secrets, has not convinced us it had ever treated such information as trade secrets. On the contrary, the evidence did show that it distributed without limitation drawings showing the very matters which it now claims as trade secrets. Admittedly it was not shown that all of National's drawings had been distributed to its customers, but the evidence presented certainly warrants the inference that National, in practice, did not refuse to distribute any drawings to its customers.

In our opinion, National's somewhat casual conduct towards its products and manufacturing processes prior to this litigation may be traced primarily to the fact that National had for many years patent protection upon which it placed its primary reliance against competition.[2]

Immediately prior to bringing this suit, National had 63 patents relating to rejectors, changers and coin-testing apparatus. 27 patents had at that time expired by reason of the 17-year limitation of the patent law and 36 were unexpired. The evidence justifies the inference that a basic patent of National was the so-called "Fry Patent" which expired August 11, 1959. Trieman testified that the Coin Acceptors group was aware of the expiration date of the Fry Patent and based their timing for the sale of the first Coin Acceptors products upon the expiration of the Fry Patent on that date. Prior to the expiration of the Fry Patent, National had engaged in litigation with the A.B.T. Corporation. Reported decisions of such litigation include the cases of National Slug Rejectors, Inc. v. A.B.T. Mfg. Corp. (7th Cir.), 164 F.2d 333; National Rejectors, Inc. v. A.B.T. Mfg. Corp. (7th Cir.), 184 F.2d 612, and

**2.** The defendants here argue that National's reliance on patents would in any event preclude their claim of trade secrets here advanced. According to defendants, National was required to reveal in its patents information sufficient to permit a skilled artisan to reproduce the devices covered thereby. 35 U.S.C. § 112. There-

fore, defendants contend National cannot now assert, as they are in effect doing, that the information contained in the patents would be insufficient to permit production of the devices. We need not answer defendants' contention, in view of our conclusion in this case.

National Rejectors, Inc. v. A.B.T. Mfg. Corp. (7th Cir.), 188 F.2d 706. National was successful in this litigation and as a result A.B.T.'s competition seriously diminished and National became the only company offering a full line of slug rejectors and coin changers to the trade. Significant is the fact that when Trieman finally told Gottfried of the defendants' operations, Gottfried's warning was against patent infringement, not against use of National's trade secrets. It appears to us reasonable to conclude that, inasmuch as National had been able to achieve a virtual monopoly position in the coin-handling industry by reliance upon patents, they felt no necessity for protecting the information regarding their products in the manner in which trade secrets must, if they are to remain such, ordinarily be handled.

National would support its contention that it had trade secrets in its devices by pointing to the fact that, prior to this litigation, the parties hereto had recognized that trade secrets are involved in the manufacture of coin-handling devices. National points to its licensing agreements with other manufacturers which provided that National was disclosing "confidential and secret technical information and 'know-how' engineering knowledge, drawings, specifications and data." The licensees of these agreements promised to hold in confidence such information which was "reasonably necessary to enable [licensee] to manufacture" National's devices. Also pointed out is the transaction by which in January, 1959, "Old" National sold its assets to "New" National. Specifically mentioned among the items transferred were "Old" National's "confidential and secret and technical 'know-how' engineering knowledge, drawings, specifications and data" together with all its rights and causes of action in regard thereto.

■ Just what the effect of these agreements would be were this litigation between the parties to them, we need not attempt to determine. Conceivably, National could

license manufacturers to produce devices which actually involved trade secrets. Likewise "Old" National may well have had trade secrets which it could transfer to "New" National. The currency changer products in the process of development by "Old" National at the time of this transaction, undoubtedly involved legitimate trade secrets which "Old" National might transfer. However, the agreement between "Old" and "New" National could not as to third parties make trade secrets out of information which neither "Old" National nor "New" National actually treated as such.

■ National also points to the October 1961 contract among Vendo and Coin Acceptors, Trieman, Melvin and Pierz, which provides that "all technical information resulting from [engineering] services by Acceptors for Vendo is to be considered as confidential trade secrets." The fact that these parties so contracted could not give rise to trade secrets in National's devices. Whether or not there were trade secrets as to them depends upon the conduct of the parties with regard to the information. Again, as between Vendo and the other parties of the contract, trade secrets could clearly exist in, for example, unmarketed products. See Winston Research Corp. v. Minnesota Min. & Mfg. Co. (9th Cir.), 350 F.2d 134.

■ The agreements here pointed to by National cannot be given the effect that the court in Hulsenbusch v. Davidson Rubber Co. (8th Cir.), 344 F.2d 730, accorded the defendant's recognition of the secrecy of the plaintiff's processes and memoranda and correspondence. In that case the court found that the plaintiff did have trade secrets in processes for producing automobile crash pads. Defendant was under a restrictive contract not to reveal trade secrets. When he sought in a proceeding to enforce his contract to deny that the plaintiff had trade secrets, his previous acknowledgment of such trade secrets which the court found actually to exist was given

some significance. Here, as to the devices in question, we have concluded that there were no trade secrets. The agreements to which National points are without significance.

Although never conceding the absence of technical trade secrets, National on this appeal somewhat de-emphasizes the technical trade secret aspect and insists that the relief afforded by the trial court must be viewed primarily in the light of the conduct of the defendants. According to the Restatement, supra, § 757, p. 7: "Although given information is not a trade secret, one who receives the information in a confidential relation or discovers it by improper means may be under some duty not to disclose or use that information." National points to the statement of Mr. Justice Holmes in E. I. Du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 102, 37 S.Ct. 575, 576, 61 L.Ed. 1016:

"The word 'property' as applied to * * trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. Whether plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations."

Relying upon such subsequent cases as Smith v. Dravo Corp. (7th Cir.), 203 F.2d 369, Franke v. Wiltschek (2nd Cir.), 209 F.2d 493, Standard Brands, Inc. v. United States Partition & Packaging Corp. (D.C., E.D.Wisc.), 199 F.Supp. 161, Head Ski Company, Inc. v. Kam Ski Company, Inc.

(D.C.Md.), 158 F.Supp. 919, and Schulenburg v. Signatrol, Inc., 33 Ill.2d 379, 212 N.E.2d 865, National tells us that "[t]here is no reported case which discloses a degree of breach of trust, infidelity and business avarice as is found in the record in the case at bar. There is no reported decision which condones the conduct of the appellants in the case at bar." We shall analyze what the record in this case does show.

■ There can be no doubt that the four original signers of the November 14, 1957 agreement, and subsequent signer Pierz, sought to get into the coin-handling business in competition with National without National's knowledge. Despite the juvenile club overtones of the agreement, we do not consider its language alone sufficient to justify the inference that the agreement was designed to cloak in secrecy a conspiratorial venture to undermine National and enable the signers to get into the coin-handling business by underhanded means. We cannot overlook the fact that Melvin and Vaccaro were skilled artisans, with little formal educational background, not sophisticated entrepreneurs. We know little of Handing's background. Trieman was the salesman. He sold the others on the idea that they could overcome their frustrations with National and achieve the American dream of a business of their own. None of the group had substantial financial resources.

■ The law recognizes that employees may agree among themselves to compete with their then employer upon termination of their employment. Restatement, Agency (2d) § 393, comment e. Such employees are not limited merely to so agreeing during their employment with the employer with whom they intend to compete. They may plan and prepare for their competing enterprises while still employed. Keiser v. Walsh, 73 App.D.C. 167, 118 F.2d 13, 14. If such right is to be in any way meaningful for an employee not under contract for a definite term, it must be exercisable without the necessity of revealing

the plans to the employer. See Midland-Ross Corporation v. Yokana, 3 Cir., 293 F.2d 411, 413[3]. We reject National's position that, from the inception of the agreement, the signers breached their fiduciary duty to National.

The first affirmtaive act of misconduct pointed to by National relates to the three-cradle scavenger. Melvin sketched the plan for the device at his home. Vaccaro roughed out the part on the machinery he had at his home. Although the idea for the change originated from knowledge that National's 3-in-1 did not operate satisfactorily, the idea was not novel. An A.B.T. 3-in-1, found in National's morgue, employed the idea.

In this connection, we note that National here suggests, apparently for the first time, that, totally apart from the question of misappropriation of trade secrets, it is equitably entitled to the coin-handling device designs which were developed by the individual defendants while they were its employees. Apparently some sort of extension of the "shop right" rule is invoked. National charges that the individual's activities constituted a breach of their duties as agents to inform their principal as to matters relevant to affairs entrusted to them (Restatement, Agency (2d) § 381, p. 182) and to act solely for the benefit of the principal in all matters connected with their agency. Id., § 387, p. 201. However, none of the individual defendants was under an express agreement such as that relied upon in State ex rel. Duggan v. Kirkwood, 357 Mo. 325, 208 S.W.2d 257, 2 A.L.R.2d 216, cited by National, to devote their full time and effort to National. There was no evidence that any of the defendants had the express duty to design devices for National, as did Cunningham in the case of Standard Brands, Inc. v. United States Partition & Packaging Corp., D.C., 199 F.Supp. 161. The information of which the individual defendants made use was general information obtained in the ordinary course of their employment, not information gained in confidence in the course of a specific agency, such as was involved in Central Ry. Signal Co. v. Longden (7th Cir.), 194 F.2d 310. In that case, the president of a corporation, under instructions from his board of directors to ascertain whether or not the Navy might be interested in contracting with the corporation for naval munitions, diverted to his own benefit the opportunity found to exist. Likewise, in Nye v. Lovelace (5th Cir.), 228 F.2d 599, the agent for the specific purpose of procuring mineral interests was held to hold on behalf of his principal a tract purchased on his own account when the opportunity to make the purchase was due entirely to his agency and could be consummated only by consummating the principal's transaction.

■ The above cases, cited by National, are typical of those in which an agent is held to hold as a trustee ex maleficio on behalf of his principal. They are not applicable to this case. We would not conclude, solely on the basis of their employment by National, that National was entitled to the designs arrived at by employees working outside the hours of their employment.

To return to the specific acts of misconduct or breach of trust charged by National, Vaccaro did cut out the 3-cradle scavenger from a piece of scrap brass taken from National's plant. The finished product measures some four by five inches. Cradles and cradle pins were obtained from National and used in the testing of the device. However, the evidence showed a fairly "loose ship" insofar as the employees' use of scrap materials was concerned. The intrinsic value of the scrap brass and the testing cradles was quite small.

■ The individual defendants did set up their shop, first in the barn, then on Olive Street and finally on Hereford Street. All were employees of National at the time that the barn and Olive Street shops were set up. Melvin was no longer an employee when the move was made to

Hereford Street and Trieman had announced his intention to leave National. Tools and machinery were also purchased, but we do not consider such activities beyond the scope of legitimate moves by an agent to compete upon the termination of his agency.

Boxer was incorporated in October, 1958. Again the individual defendants went to considerable length to avoid revelation of their organization to National. However, the use of dummy incorporators is not necessarily a badge of fraud or bad faith.

Melvin did deceive Wallin when, on leaving to work full time for Boxer in March, 1959, he told Wallin that he was going to work for Cavic Engineering. As an incident to this deception and possibly as evidence of the esteem which Wallin had for Melvin, the group obtained work indirectly from National. Vaccaro had previously used his position to obtain work for the group through Elliot Tool Company. There is no contention that the work done was work which might otherwise not have been farmed out by National. Nor is there any complaint that National did not receive full value for the sum $3100 received by the group.

From the outset, the Boxer group undoubtedly had in mind the production of devices which would practically duplicate those of National. In view of National's monopoly position, competition would have little alternative otherwise. The devices by themselves are not usable. They must be used in connection with other mechanisms which provide a product or service. They must be fitted into the other mechanism which must provide the space required for the device, as well as the necessary openings for receipt of coins, the return of rejected coins, the path by which the accepted coins activate the mechanism, as well as openings for the mounting of the rejector or changer. In effect, National's devices set the standard in such regard. Competition could either accept

such standard, or design devices to their own measurements and seek to convince vending machine manufacturers to adapt their products to receive a device of different size. The fact that Trieman told Melvin that the Boxer devices should not vary from National's by even a ten-thousandth of an inch is, in such circumstances, not surprising.

There is no evidence that the National devices which the Boxer group examined and measured were obtained from National by subterfuge or improper means. Perhaps Melvin took Gottfried a bit literally when he accepted his invitation to take a changer and rejector home and sleep over the problem with which he was concerned at the time. However, Melvin did not take the device with the idea that it might be used as it eventually was. Three fifty-cent rejectors, purchased from National, were measured and examined in connection with the design of Coin Acceptors' fifty-cent unit. Coin Acceptors also engaged in the servicing of coin-handling devices and had National products. Some reference was made to National products in Coin Acceptors' shop for service.

The copying of National's devices by the defendants was not per se wrongful. Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661; National Welding Equipment Co. v. Hammon Precision Equipment Co. (N.D. Cal., S.D.), 165 F.Supp. 788.

Other than the scrap brass and the cradles and pins for the three-cradle scavenger, there was evidence that Vaccaro had molten zinc poured at National into a form for a magnet bracket. Vaccaro described the dimensions of the form as 2½ inches square by an inch deep. This evidences the amount of metal involved. Vaccaro also had National employees make the form block to stamp the ribs in the Boxer group's scavenger. Vaccaro testified that he brought magnets from National. Melvin stated, however, that the magnets which the group used

came from the National devices at the various shop locations. Vaccaro testified that metal from National was used at the barn for other parts. The amount of metal involved was not stated. However, the work at the barn was on a model of the ten-cent unit which would have required only a small amount of basic materials. Vaccaro also testified that National's screws, cradle pins and bushings were taken by him to the shops in the barn and on Olive Street.

■ The activity of defendants which causes us the greatest concern is the use of National's mainplates and blueprints. Both Vaccaro and Melvin testified concerning the use of a National mainplate in the work on the ten-cent unit. Their testimony was that a flat, unformed plate was used to locate the holes and cut outs on the mainplate for the defendants' model machine and also in making the dies for the manufacture of the device. National makes the point that Vaccaro was careful to obtain a "perfect template" for this purpose. We find that the evidence shows only that Vaccaro obtained from stock a plate which he knew had been run shortly after National's tools had been checked for accuracy.

There was also testimony about the use of a formed mainplate. Vaccaro testified that he had National's tool room form a flat plate which he took to the defendants' shop. Just what use was made of this part was not shown. We note that, when first questioned about the use of a formed plate, Vaccaro stated that he had not brought out such a part. Melvin denied knowledge of the use of a formed mainplate of National.

Both Melvin and Vaccaro testified about the presence and use of National's blueprints. Vaccaro testified that Melvin, while working at the barn on the scavenger, asked Vaccaro to bring out National's drawing of this part and he did so. Vaccaro stated that he brought out "some other drawings, three, four, five, something like

that. I don't recall how many or what they exactly were * * *." When asked whether or not there were other National drawings at the barn, Vaccaro stated: "I don't recall. I don't recall what the other ones were, if there was any out there. * * I don't recall too many drawings out there. I know there was, I would say totally most probably six or eight. I don't know, something like that." Vaccaro stated that there were also National drawings at the Olive Street shop. In response to National's counsel's repeated leading questioning, Vaccaro stated that such drawings at Olive Street were in addition to those he saw at the barn. In response to a subsequent question as to whether there were more of National's prints on Olive Street than there had been at the barn, Vaccaro stated: "Oh, all I know, there was prints at Olive Street. I don't know if there was more or how many, exactly, * * *."

On cross-examination, Vaccaro repeated that he brought out the scavenger drawing for the ten-cent unit. He also stated that he brought out "about three or four drawings" pertaining to National's single coin rejector. He repeated this testimony on redirect examination. Vaccaro did not identify what parts the drawings were for, although he stated that he didn't have a drawing for the magnet bracket, the knockout or a coverplate. Vaccaro testified that he actually did not work from National's drawings, but used layouts drawn by Melvin or Pickett.

Melvin was asked whether or not he used National's drawings in designing the mainplate for defendants' ten-cent device. His response was: "I don't recall a drawing at the barn. It seems that I recall a drawing or two at University City (Olive Street)."

"Q Those drawings were drawings of what?

"A To the best of my recollection that was a drawing of some portion of the dual 3-in-1 unit."

Subsequently, Melvin repeated that drawings for National's 3-in-1 were at the Olive Street shop. "I can't recall just what those drawings covered. I feel sure that we did have the mainplate drawing, at least, and we had some other drawings." When asked whether or not he had requested Vaccaro to get drawings for him, Melvin replied: "I don't recall doing so." When asked on redirect examination: "Isn't it a fact that you asked Mr. Vaccaro to obtain a scavenger drawing?"— Melvin replied: "It is not." National's counsel posed this question: "Drawings were brought out to the farm and to Olive Street, were they not, drawings of National Rejectors?" Melvin's response was: "We had drawings, some drawings on Olive Street."

On cross-examination, Melvin stated that they had drawings of National's 3-in-1 rejector at Olive Street and "some way, some more drawings came in on the single coin units." He identified the 3-in-1 drawings as of the scavenger, the five-cent coverplate and "I feel sure that we had a drawing of the mainplate."

On redirect examination, Melvin stated: "Mr. Jenner, we had both models and drawings to some extent on the single coin units, on the 3-in-1. I don't recall any drawings on the coin changer."

Coin Acceptors' counsel was not satisfied to let the matter rest at this point and on recross-examination advised Melvin that he wanted to get clear what National prints were used by defendants at what locations. Melvin's response was: "I have not been very clear to exactly what prints we had and how many we had." When asked whether or not, in fact, Melvin did not recall having any of National's 700 Series prints, Melvin replied: "At one time I recall that we had prints. To the best of my recollection I will have to stick by that, sir."

When asked whether or not in his statement to Mr. Marshall in October, 1960, he stated that the group did not have Na-

tional's 700 Series drawings, Melvin acknowledged that in reply to a question in such regard he stated: "I can't remember for sure if we had drawings or not, but again after all these years we was enough experienced that we didn't need them, although they might have been helpful." Melvin explained that the answer was intended to refer only to the activity at the barn. "I will state today that I don't recall having any drawings at the barn on the Theis Farm." When, in response to a question by the court, Melvin stated that they did have National's 700 prints at Olive Street, the following ensued:

"MR. ALBRECHT: * * * Could you explain what you meant by that language 'to an extent' that you had some prints?

"A At Olive Street we had some prints and by saying 'extent' I don't know how many we had, if we had full sets, part sets, or what. That is what I had reference to.

"Q Well, as you now sit here can you recall specifically whether you had one or how many you had?

"A We had several prints, Mr. Albrecht. I can't recall how many. But I don't—as I sit here today I feel sure that we never had a full set of prints on any of these mechanisms.

"Q And you wouldn't be able to enlighten the Court as to whether it was one or two or more?

"A It was several prints.

"Q Well, several could be ten thousand, Mr. Melvin. Can you enlighten the Court in any way as to what you mean by several?

"A Well, fifteen or twenty."

We have examined the direct testimony with regard to the use of National's drawings in detail because of the significance of this alleged activity. Melvin and Vaccaro offered the only direct testimony on

this subject. All of the defendants' witnesses who were asked had no knowledge of the use of any of National's detail drawings or prints for either the single coin or 3-in-1 units. The testimony of Melvin and Vaccaro is vague and contradictory. Vaccaro testified that he brought prints to the barn at Melvin's request. Melvin denied that there were prints at the barn and that he made any request to Vaccaro to procure prints. Although Melvin limited his failure, in the October, 1960 statement to National's counsel, to recall having National's prints to the activity at the barn, we note with interest that the petition in this case does not contain any allegation that the defendants made use of National's drawings or blueprints. The petition charges only that the defendants' designs were arrived at by copying National's *devices* which were secretly taken from National's plant to the defendants' work shop.

The only other evidence on the question of copying National's drawings was the expert testimony of its expert witness, Don A. Fischer, Dean of the Washington University School of Engineering. With the assistance of employees of National, Boxer-Coin Acceptors' drawings were compared with the drawings of National. According to Fischer, the object of the comparison was to pick out the Boxer-Coin Acceptors' drawings which "conclusively showed to [him] that information was obtained from National." He also endeavored to find the drawings referred to in Vaccaro's testimony. As a result of his examination, Fischer produced fourteen Boxer-Coin Acceptors' drawings for the following and testified concerning them: Ten-cent rejector mainplate and scavenger; twenty-five-cent rejector mainplate and cradle; 3-in-1 mainplate, ten-cent and twenty-five-cent coin path deflector, and ten-cent coverplate; fifty-cent unit cradle and main channel, magnet drawing, and coin changer switch. His comparison of the Boxer-Coin Acceptors' drawings with National's drawings showed 79 dimensions on the Boxer-Coin Acceptors' ten-cent mainplate drawing which were identical with dimensions and tolerances shown on National's print; 26 identities on the ten-cent scavenger drawings; 76 identities in twenty-five-cent mainplate drawings; 16 identities in the twenty-five-cent cradle drawings; 212 identities in the 3-in-1 mainplate drawings; 11 identities in the ten-cent and twenty-five-cent coin path deflector drawings; 106 identities in the ten-cent coverplate drawings; 16 in the fifty-cent cradle drawings; and 80 in the fifty-cent main channel drawings. He found identities of textual materials and tolerances in the coin switch drawings. He further found textual identities and strength values and ranges of some of the magnets shown on the magnet drawings.

Based upon his comparison, Fischer concluded generally that the person preparing the Boxer-Coin Acceptors' drawing for each of the parts involved either had National's drawings for the comparable part or had information that was obtained from either the National drawing or from people familiar with National's drawings. Although he first stated that, in his opinion, some of the Boxer-Coin Acceptors' drawings had been copied from National's drawings, he subsequently modified his conclusion to that stated above.

While there is no direct accounting for the defendants' switch drawing, which is dated March 19, 1960, and bears Umbright's name as the draftsman, the evidence showed that National purchased switches from manufacturers and did not construct them themselves. There is evidence that National circulated its switch drawings freely. Melvin testified that Boxer-Coin Acceptors did not have any drawings for National's changers, the devices on which the switch was employed. Had Melvin known that such drawings were in the hands of the Boxer-Coin Acceptors' personnel (and as chief engineer he would have been in a position to know), we have no doubt that he would have so

testified. The trial court observed that Melvin was "doing everything he can to help the plaintiff; there is no question about that."

Joseph A. Lotspeich, a former employee of National who became chief draftsman for Coin Acceptors, testified concerning the preparation of defendants' fifty-cent unit drawings. He worked on these drawings after going to work for Coin Acceptors. He testified that the drawings were based, in part, upon the measurement of National's commercially produced device and also upon information obtained from mounting drawings obtained from Seeburg, Wurlitzer, and others.

Haverstick testified that he knew National's magnet charts and drawings by memory and that after going to work for Coin Acceptors he dictated to Pickett the table and text for the magnet drawing of Coin Acceptors which Fischer examined.

Insofar as these drawings are concerned, we conclude that Fischer's opinion testimony is insufficient to show that defendants' drawings were the result of the misuse of National's drawings by Coin Acceptors' employees. The information which Lotspeich and Haverstick employed on the fifty-cent drawings and the magnets, respectively, had not been imparted to them under circumstances which render the use of such information by Coin Acceptors illegal. See Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 213 A.2d 769, 777 [19]. National did not manufacture the switches described in the switch drawing, although it contended that it had developed the specifications for the part. However, the free circulation of such specifications precludes the conclusion that Coin Acceptors' drawing was the result of any misuse of knowledge or information which National endeavored to guard as a trade secret.

As for the twenty-five-cent single coin unit drawings, Melvin, although referring generally to drawings for National's single coin unit, did not identify any of them as for the twenty-five-cent unit. Defendants' twenty-five-cent mainplate is essentially an adaptation of their ten-cent device mainplate. The large number of similarities which Fischer found between National's and defendants' drawings for the twenty-five-cent mainplate are actually based almost entirely upon comparison of National's twenty-five-cent mainplate drawing and defendants' ten-cent mainplate drawing. As is the case with all of the drawings compared by Fischer, there are dissimilarities as well as identities between the dimensions and tolerances shown. Defendants' witness, Joseph A. Lotspeich, testified that his comparison of National's and defendants' twenty-five-cent mainplate drawings revealed 60 differences in tolerances, 24 differences in dimensions and 35 other differences, or a total of 119 differences between National's twenty-five-cent mainplate drawings and Boxer and Coin Acceptors' drawings for their twenty-five-cent mainplate.

In view of the legitimately acquired knowledge on the part of Boxer-Coin Acceptors' employees of National's devices, we do not find Fischer's testimony alone sufficient to support a finding that the Boxer-Coin Acceptors' drawings which he found comparable to National's were the product of misappropriation or misuse of National's drawings. This was a matter on which National had the burden of proof. We are not, in the light of all of the evidence, persuaded by Fischer's testimony.

As to the use of some of National's drawings for the 3-in-1 and the single coin units, Fischer's testimony does lend support for the not wholly convincing testimony of Melvin and Vaccaro. However, Fischer's testimony does not support the statement of the somewhat exasperated Melvin that some 18 to 20 of National's drawings were used in designing defendants' single coin units. Fischer's examination and comparison of all of National's and defendants' drawings in an effort to locate

the three to six drawings Vaccaro claimed to have brought for the use of defendants produced only two drawings, the ten-cent mainplate and the scavenger. The latter was the only drawing Vaccaro had expressly referred to so Fischer's choice of it is not unexpected. However, the evidence pertaining to this part must be viewed in the light of Melvin's denial of Vaccaro's testimony about the use of National's scavenger drawings.

Fischer's findings are corroborative of Melvin's testimony regarding the use of National's 3-in-1 mainplate drawing. However, Melvin's testimony was that drawings for the five-cent coverplate were used and Fischer compared the ten-cent coverplate drawing for the 3-in-1 unit. In view of Melvin's limitation of the number of National's 3-in-1 drawings, we are unwilling to speculate just which drawing was used. The deflector, concerning which Fischer testified, is a small, easily measurable part and there is no direct evidence that drawings for this part were used by defendants.

▮ In our opinion, the evidence does support the conclusion that defendants did make some use of National's blueprints in the designing of the ten-cent single coin device and the 3-in-1 rejector. However, the evidence as to the scope of such use is vague and inconclusive. Certainly it does not support the finding of the trial court that there was a "systematic copying" of National's blueprints.[3] None of defendants' drawings was shown to be a

copy of a drawing of National. Fischer receded from his originally expressed opinion that certain of the defendants' drawings about which he testified were copied from National's drawings, finally stating that the person making defendants' drawing either had National's drawing before him or knowledge of the information contained therein. On even the drawings compared by Fischer there were many dissimilarities, in some instances outnumbering the similarities which Fischer found. Furthermore, it is obvious that, with respect to many of the component parts of the defendants' device, they could not have been produced from either National's drawing or copies thereof. The apparent difference between the comparable parts of the product would have shown that the use of National's drawings to make the parts for defendants' device would have been impossible. We do not preclude the possibility that some dimensions might have been taken from National's drawings, but this is not a case such as Schulenburg v. Signatrol, Inc., 33 Ill.2d 379, 212 N.E.2d 865, where the former employer's drawings were copied in toto to produce an identical product. 212 N.E.2d 867.

▮ The evidence failed to establish the misuse of National's drawings for the one-cent and fifty-cent sections of the 4-in-1 units and the changers. Furthermore, the evidence failed to show knowledge on the part of the other individual defendants of Melvin's and Vaccaro's activity with respect to National's drawings and evidence

3. The trial court, in finding a "systematic copying" of National's blueprints, made frequent reference to defendants' failure to call as a witness the former Boxer-Coin Acceptors' employee, Pickett, the draftsman who prepared the early drawings of defendants. However, the burden was upon National to prove, not upon defendants to disprove, misuse of National's drawings. No inference can properly be drawn, in any event, from the failure of defendants to call Pickett as a witness. He had left defendants' employment long before the trial and he had accepted employment by Melvin to carry out the

$180,000 worth of work given Melvin by National Vendors after Melvin left Coin Acceptors. Melvin employed not only Pickett, but also his father and his brother. Melvin certainly cooperated with National, both prior to the trial and as a witness. In such circumstances, the unfavorable inference which obtains from failure of a party to call a witness under his control is not to be drawn against defendants. White v. Metropolitan Life Ins. Co., Mo.App., 218 S.W.2d 795, 800 [13, 14]; In re Warden, 347 Mo. 196, 146 S.W.2d 874, 888 [3].

that Vendo had any such knowledge, as discussed more fully below, is wholly lacking.

■ We touch briefly upon the trial court's finding that "The individual defendants, pursuant to and in furtherance of the conspiracy, induced others of plaintiffs' employees to join the conspiracy." The allegation in National's amended complaint is that defendants Trieman, Pierz and Coin Acceptors, in furtherance of their conspiracy, secretly induced certain employees of National to terminate their employment and enter the employ of Coin Acceptors. Named as having been so induced were: M. P. Haverstick, Joseph F. Lotspeich, Joseph A. Lotspeich, Joseph Giamanco, Joseph Van Middlesworth, Joseph (or John) Niemeyer, Norm Burzen, Leonard Kornfeld, Robert Smith, Edward D. Wells, James Moran, Edwin Gaetz, Chester Victor and Robert Chagnon.

■ Other than a general invitation to invest in the Boxer group's enterprise on April 9, 1959, at which their plan was revealed to some of the employees named, the only substantial evidence on this subject was by the testimony of several of the employees who were allegedly induced to leave National. These employees all testified that they left National for personal reasons. There was general dissatisfaction about National's reorganization, salaries and treatment of them in relation to newer employees. Only Haverstick, of those who testified, was approached by Trieman regarding employment with the Boxer group; all left National voluntarily, and, with the exception of Haverstick,[4] initiated contact with Boxer to seek employment. The rec-

ord does not justify a finding that these ex-employees were induced by the Boxer-Coin Acceptors group to join the conspiracy. The only inducement at all, shown by the evidence, was for employment, and not to join a conspiracy. It is certainly not wrongful for these employees to terminate their employment, or for the Boxer-Coin Acceptors group to offer the same to them, in the absence of noncompetitive restrictive covenants. Standard Brands, Inc. v. United States Partition & Packaging Corp., D.C., 199 F.Supp. 161, 174 [11]. There is no evidence that Coin Acceptors lured away any of these employees in order to acquire, through them, real protectible trade secrets of National. See Colgate-Palmolive Company v. Carter Products, Inc. (4th Cir.), 230 F.2d 855. Nothing is shown by the record that anything other than the knowledge, skill and experience of these employees was acquired by the Boxer-Coin Acceptors group.

Is this a case for the granting of trade secret relief, even in the absence of technical trade secrets? The answer depends upon whether the conduct of the individual defendants, as former employees of National, was such as to deprive them of the right which they would otherwise have to produce coin-handling devices patterned after those of National.

Although there is little basis for commendation of their activity, the individuals here involved, singly and collectively, were not guilty of the type of misconduct which afforded the basis for trade secret relief in many of the cases relied upon by National. The case of Smith v. Dravo Corp. (7th Cir.), 203 F.2d 369, strongly relied upon and cited by the trial court in its

---

4. We reject the contention that Haverstick, while still employed by National between February, 1959, and September, 1959, reviewed Pickett's drawings for Boxer. Haverstick denied any contact with Boxer during that period. The contention is based upon the appearance of Haverstick's initials on Boxer drawings bearing dates between March and July, 1959. The drawings on which his initials appear all bear revisions subsequent to the date that Haverstick went to work for Boxer. Our conclusion is that Haverstick placed his initials on the drawings at the time of their revision, not at their original dates. We reach the same conclusion regarding the approval by Chagnon of the switch drawing, originally dated March 19, 1960, before Chagnon left National.

memorandum, is readily distinguishable. That case involved the design of cargo containers for use on ships and other means of transportation. Some 100 of the devices had been constructed and leased to shipping companies. An application for a patent for the device had been filed. The defendant became interested in the use of the devices and discussed their acquisition with representatives of plaintiffs. Subsequently, defendant indicated an interest in purchasing the plaintiffs' business. Plaintiffs sent defendant copies of their patent application, blueprints and other information, including names of potential customers. Plaintiffs and defendant negotiated regarding the sale. The day following the unsuccessful termination of negotiations, defendant announced that it was going into the design and production of shipping containers. It did so and plaintiffs brought suit charging that defendant obtained, through a confidential relationship, knowledge of plaintiffs' secret designs and plans, which it used for its own advantage and to plaintiffs' detriment. The trial court denied the injunctive relief sought. The basis of the trial court's action was its conclusion that plaintiffs had no legally protectible trade secrets because information as to the design of the containers had been revealed in plaintiffs' publicly distributed products. The circuit court held the trial court's determination erroneous. In so holding, the court stated (203 F.2d 375):

"It is unquestionably lawful for a person to gain possession, through proper means, of his competitor's product and, through inspection and analysis, create a duplicate, unless, of course, the item is patented. But the mere fact that such lawful acquisition is available does not mean that he may, through a breach of confidence, gain the information in usable form and escape the efforts of inspection and analysis. The fact that a trade secret is of such a nature that it can be discovered by experimentation or other fair and lawful means does not deprive its owner of the right to protection from those who would secure possession of it by unfair means.' Nims, Unfair Competition and Trade Marks, Sec. 148."

The court found a breach of confidence in that plaintiffs had "disclosed their design for one purpose, to enable defendant to appraise it with a view in mind of purchasing the business. There can be no question that defendant knew and understood this limited purpose. Trust was reposed in it by plaintiffs that the information thus transmitted would be accepted subject to that limitation." 203 F.2d 376 [8].

██ In this case, there was no evidence of use by defendants of information which National had divulged to them on a confidential basis. The defendants did obtain general information regarding coin-handling devices and specific information regarding National's devices as a result of their employment by National. However, the fact of employer-employee relationship is not, by itself, sufficient to cause a confidential relationship to exist as to knowledge which is the natural product of the employment. There must be either an express understanding as to the confidential nature of the information or it must be acquired under such circumstances that the employee must necessarily be aware of the confidence reposed in him.

The situation in Franke v. Wiltschek (2nd Cir.), 209 F.2d 493, also relied upon by National, was similar to that presented in Dravo. In Franke, the information was obtained in negotiations for defendants' handling and selling plaintiffs' products. After the information regarding the process for producing the product, scented wash cloths, had been revealed to defendants on that basis, they terminated the negotiations and began producing the product themselves.

Schreyer v. Casco Products Corp. (2nd Cir.), 190 F.2d 921, involved the disclosure of information regarding a product (an electric steam iron) "solely in aid of an abortive attempt to negotiate a license

agreement under [a] * * * patent * * *." 190 F.2d 924. The court held that the negotiations had produced a confidential relationship, resulting in a restriction upon the right of the disclosee to use the information only for the purpose for which it was disclosed, even in the absence of any express agreement to such effect.

Among cases involving employer-employee relationship National relies strongly upon Schulenburg v. Signatrol, Inc., 33 Ill. 2d 379, 212 N.E.2d 865. In that case plaintiffs manufactured flashers used in connection with electric signs. Former employees of plaintiffs organized the defendant corporation and produced flashers which were identical to the plaintiffs' product. The court found that the former employees had copied the plaintiffs' blueprints and drawings and had also used information contained on plaintiffs' blueprints which the individual defendants had memorized. The court held that the information contained in the blueprints constituted a trade secret. The court stated (212 N.E.2d 869):

"The measurements, tolerances, quality of material, etc., cannot ordinarily be discovered by these means without expensive and time-consuming analyses. Plaintiffs have gone through this process by trial and error and have preserved the information thus acquired in working drawings and blueprints. Defendants, however, have chosen to capitalize upon their positions of trust— to clandestinely acquire the blueprints and reproduce them exactly. There is evidence in the record indicating that when some of defendant's drawings are superimposed over plaintiffs' corresponding ones, they match exactly—even to the lettering thereon. Better evidence of copying would be hard to obtain. In fact, defendants have even copied some of plaintiffs' mistakes."

The court found that these matters were trade secrets although it was conceded that the plaintiffs' finished products might be reproduced by copying by legal means.

There was, however, a significant element in that case which we do not find to exist in this case. The Illinois Supreme Court stated: "The trial and the appellate courts concluded that the manufacturing 'know-how' contained in the plaintiffs' blueprints and drawings were trade secrets in view of the fact that they were kept confidential and that plaintiffs considered such as secret and attempted reasonably to keep it so." Our analysis of National's activity in this case has led us to the conclusion that it had not considered the information on its blueprints and drawings trade secrets and had made no effort to keep such matters secret.

In Standard Brands Inc. v. United States Partition & Packaging Corp. (E.D.Wisc.), 199 F.Supp. 161, four individuals who had been the president and general manager, vice-president in charge of production, vice-president in charge of sales and the tool room foreman of the American Partition Company which eventually was absorbed in Standard Brands Inc. as an unincorporated division of that company, undertook, while occupying those positions, to go into business in competition with Standard Brands in the manufacture of chipboard partitions for containers used in packaging. While retaining their positions with American or Standard Brands Inc., they organized the defendant corporation. They obtained a set of the blueprints of American for the machinery used in manufacturing partitions. A total of 671 drawings was involved. These were used to construct manufacturing units for the defendant. Individual defendants also obtained patterns relating to the plaintiff's equipment from which in excess of 1978 cast parts were prepared for the manufacturing machinery. While still employed at American, individual defendants incurred promotion expense in the amount of some $68,000 involving the purchase of gifts, meals and entertainment for the customers of American. The evidence showed that these expenditures were intended to establish good will on the part of the beneficiary toward the individual defendants who incorporated defendant corporation. At the time that the individual defendants resigned their positions at

Standard Brands, they were ready to go into business in competition with plaintiff and did so within a few days thereafter.

In an action for injunction the trial court held that the defendants had violated their fiduciary duty to Standard Brands. "This unlawful conduct commenced after defendants agreed during the spring of 1956 to prepare for engaging in a competitive enterprise. It involves their acts in procuring the means to fashion their enterprise by appropriation of their principal's property without full disclosure as to the nature and purpose of their activities to Standard Brands." 199 F.Supp. 172. The court found that there had been a wrongful appropriation and utilization of the plaintiff's drawings and of its patterns to fabricate castings. The court also found that defendants had utilized plaintiff's employees for the purpose of facilitating and speeding their entry into business in competition with the plaintiff. The court also found that the sales promotion and customer solicitation practices were wrongful. "These activities were wrongful because defendants had not informed American or Standard Brands of their plans to engage in a competitive enterprise and of the steps already undertaken in the accomplishment of their objective." 199 F.Supp. 173.

Standard Brands involved wrongful conduct on the part of the highest echelon of the business with which competition eventually resulted. It also involved the use of the entire set of the blueprints of the former employer, widespread use of its property and of its employees. It also involved large expenditures by individual defendants of the plaintiff's money in an effort to further the defendants' enterprise.

In the present case we are not concerned with the activities of top echelon corporate officials. None of the five members of the original Boxer group held an executive position with National. Trieman had the title of sales manager, but apparently had little discretionary authority. Melvin was a modelmaker. Vaccaro was the foreman of the tool room, a position which is also involved in Standard Brands. Vaccaro, however, withdrew from the Boxer operation well before it became an operable enterprise. Handing apparently was a purchasing agent. There is nothing to show that he was in charge of all of National's purchasing. Pierz was a branch office manager. The use of National's property and personnel in this case was minimal. Likewise the use of National's blueprints was far from the use of the entire set of prints as the defendants did in Standard Brands.

We note that in Standard Brands the court particularly emphasized the failure upon the part of the individual defendants to notify Standard Brands of their projected competition. National here states that a similar duty rested upon the individual defendants in this case and that their failure to fulfill that obligation was a breach of trust from the beginning of their enterprise. In our opinion the law does not require persons in the positions of individual defendants in this case to notify their employers of their intention to enter into competition with them upon termination of their employment. As we noted above, the imposition of such duty would, for all practical purposes, nullify the conceded right of employees to make plans during their employment to compete with their employers upon termination of the relationship.

Pressed Steel Car Co. v. Standard Steel Car Co., 210 Pa. 464, 60 A. 4, was distinquished by the Pennsylvania Supreme Court in Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 213 A.2d 769, as not involving trade secrets. E. I. Du Pont, etc. v. Masland, supra, involved, as has been frequently pointed out, the sufficiency of an application for a preliminary injunction.

National also cites and relies upon other cases involving competition by former employees. However, all of the cases relied upon are distinguishable from the situation

here presented. In Head Ski Company v. Kam Ski Company, D.C., 158 F.Supp. 919, former employees forming a competing company had agreed not to " 'divulge or impart any trade secret or company's business to any person, firm or corporation whatsoever.' " 158 F.Supp. 921. The court held that the plaintiff's processes, methods and materials learned by the employees during their employment were trade secrets made protectible by the employees' contract.

In Winston Research Corp. v. Minnesota Min. & Mfg. Co., 9 Cir., 350 F.2d 134, the former employee had not only signed a noncompetitive employment contract, but the court also found that an agreement not to disclose might be implied from the former employer's "elaborate efforts to maintain the secrecy of its development program, and the employees' knowledge of these efforts and participation in them." 350 F.2d 140.

In Ernst Slide Fastener Co., Inc. v. Stamberg, Sup., 120 N.Y.S.2d 311, the former employee had agreed in his employment contract to hold the plaintiff's trade secrets in secrecy. The court also found extensive activity on the part of the employer to maintain the secrecy of the information there involved. The court stated: "The testimony is clear that defendant Lamnin knew that the plaintiff considered that its die and drawings were a secret. His contract of employment enjoined him from disclosing secrets. The plaintiff took precautionary measures to keep strangers out of the premises. The door to the room in which the drawings and prints were, was kept locked." 120 N.Y.S.2d 315.

Again, in Space Aero Products Co. v. R. E. Darling Co., 238 Md. 93, 208 A.2d 74, the court concluded that the former employer had taken extensive measures to guard the secrecy of the trade secrets. The evidence in that case showed that the activities and processes were kept secret from other employees. The employees' training guide warned that the methods and processes of the employer must be considered as trade secrets. A lockbox was kept in the plant for blueprints and a list of authorized personnel with keys was carefully maintained.

Missouri trade secret cases relied upon are clearly distinguishable from this case. In Germo Manufacturing Co. v. Combs, 209 Mo.App. 651, 240 S.W. 872, the defendant, originator of a chicken-feed formula, "brought" the formula to a partnership. When plaintiff corporation was organized, the assets of the partnership, including the formula, were transferred to the corporation in payment for stock issued to defendant and his partner. Defendant eventually acquired all of the stock which he later sold and then went into business on his own, making and selling chicken feed based on a formula which the court found was essentially the formula transferred to plaintiff. In enjoining defendant's activity, the court found that defendant and his partner had treated the formula as a secret, had sold it as such to the corporation and had placed such fact upon the corporate records, providing an inducement for the subsequent sale of defendant's stock to others and that by reason of such facts, defendant was estopped to deny that the formula was a trade secret. 240 S.W. 881. Although the court referred to defendant's activity as a "breach of trust," the essential basis of the injunction against defendant's competition was the handling of the formula in the prior dealings between defendant and plaintiff.

In Ultra-Life Laboratories v. Eames, 240 Mo.App. 851, 221 S.W.2d 224, the defendant having sold his system of internal culling of chickens to plaintiff under an agreement to refrain from teaching, selling or disclosing "information considered trade secrets" (221 S.W.2d 229) was held not in a position to deny, as against plaintiff, that his process and methods were secret. 221 S.W.2d 232 [3, 4].

The problem in this case comes down to one of how much latitude of conduct may be allowed the defendants who decided to com-

pete with their former employer. "Two conflicting public policies are apparent. On the one hand there is the deeply imbedded tradition that favors the protection of a person's property interest in his business from unfair competition. What a person has labored for should be protected from wrongs by others. On the other hand there is the equally strong, if not stronger policy which favors free competition in the economic sphere of our society. As a corollary a person has the right to improve his socio-economic status, even if the resulting effect is somewhat detrimental to the business interest of his former employer. It is necessary that there be a balancing of the equities between these two rights, for if the former is carried to its extreme it will deprive a man of his right to earn a living; while conversely, the latter right if unchecked, would probably make a mockery of the fiduciary concept, with its concomitants of loyalty and fair play." Comment, The Obligation of a High-Level Employee to his Former Employer: The Standard Brands Case, 29 University of Chicago Law Review 339, 351–352. See Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430. In that case the court stated (160 A.2d 435): "Were we to measure the sentiment of the law by the weight of both English and American decisions in order to determine whether it favors protecting a businessman from certain forms of competition or protecting an individual in his unrestricted pursuit of a livelihood, the balance would heavily favor the latter."

In this case the balance which ordinarily favors the individual is somewhat offset by the evidence of misconduct on the part of some of the individuals concerned. While we do not accept National's characterization of this case as disclosing a "degree of breach of trust, infidelity and business avarice," found in no other reported case, it is clear that the acts of the individuals in using National's materials and drawings cannot be condoned. On the other hand, there are factors also present in this case weighing against a balance in favor of National. In the first place, contrary to the situation generally presented, the evidence here fails to show that, prior to the inception of competition by the defendants, National considered information regarding its products in the realm of trade secrets. Even when the defendants divulged to National their intention to compete, no warning was given against the use of trade secrets. See Mycalex Corp. of America v. Pemco Corp., 4 Cir., 159 F.2d 907, 912 [6] (2). Gottfried merely pointed out the danger of possible patent infringement. Even though, according to the president of Universal Match, Mr. Wilson, it was obvious that the defendants' devices were copied from National's, no steps were undertaken based on any claimed misuse of trade secrets until Melvin's statement regarding the activities of the defendants had been taken. A further factor weighing against National is the patent situation. The Fry Patent which expired in August, 1959, was the key patent relating to National's rejector devices. Were there other patents which might have prevented the copying of National's devices, we think it fair to conclude that action would not have been brought on a trade secret basis but rather an action would have been based upon patent infringement. Having failed to do so, National has acknowledged that its limited monopoly granted under the patent law has expired. Certainly the relief afforded by the trial court in this case would be effective to extend the monopoly of that patent insofar as the defendants here are concerned. The decree is broad enough to prevent their ever again competing in the manufacture of coin-handling devices. Having had the benefit of patent protection for the term of their patent, we are reluctant to grant relief which would have the effect of lengthening the term of National's patent monopoly.

One final factor of significance weighing against National is that the broad decree of the trial court would adversely affect most seriously the individuals who were not shown to have been parties to or to

have had knowledge of the acts of misconduct which were actually done by Melvin and Vaccaro. The decree would least affect these admitted wrongful actors. Melvin is no longer in the coin-handling business. Vaccaro is not a party to the action.

Each case of this nature must be decided upon its particular facts. However, we do find some significant parallels between the facts of this case and those of Midland-Ross Corporation v. Yokana (D.C. N.J.), 185 F.Supp. 594. Midland-Ross had, in March, 1958, acquired the assets of Hartig Engine and Machine Co., a corporation engaged in the design, manufacture and sale of plastic extruding machines. Defendant Yokana had worked at Hartig since 1952. He was active in all phases of Hartig's activity and at the time of the Midland-Ross transaction was vice-president of Hartig. The trial court found that defendant "was a trusted employee of plaintiff and its predecessor." 185 F.Supp. 598. After plaintiff's acquisition of Hartig, defendant decided to terminate his employment and go into business on his own in competition with plaintiff. Shortly after December 31, 1958, he submitted his resignation to plaintiff, effective January 6, 1959. On January 9, 1959, he caused defendant Sterling Extruder Corporation to be organized. Yokana had arranged financial support from persons in control of one of plaintiff's customers. The arrangement between them and Yokana was reduced to writing on January 6, 1959. Yokana obtained orders for Sterling products before the company had been formed. He also ordered parts from various suppliers, including suppliers of plaintiff, to fill orders for Sterling. Immediately upon the formation of Sterling it entered into the sale and production of plastic extruders similar to those of plaintiff.

Yokana admitted that he copied and used blueprints of plaintiff, in his possession by virtue of his activity on behalf of plaintiff, in the production of extruders which Sterling produced and sold. Orders were also made from suppliers for parts which were fabricated from drawings which plaintiff had furnished such suppliers for their use.

Plaintiff sought injunctive relief against Yokana and Sterling, charging that defendants were making use of plaintiff's trade secrets acquired by Yokana while occupying a fiduciary position of trust and confidence with plaintiff. The defense was denial of a fiduciary relationship (which the court found to exist) and of the existence of trade secrets.

Applying the Restatement definition of trade secrets, the court found that the knowledge and information which Yokana gained at plaintiff's and later and in his own behalf were not of trade secrets. National would distinguish Yokana on the basis that the device in question "was an extremely simple one which plaintiff merely assembled entirely from parts purchased from third parties." Although third parties did produce at least some of the parts for the extrusion machines, the parts were manufactured from production drawings and plaintiff had done "much experimenting in the course of evolving the production drawings * * *." 185 F.Supp. 603. In this case, although National produces some parts for its coin-handling devices, it also has parts fabricated by outside suppliers, based upon National's production drawings which, according to National, contain trade secrets in the dimensions, tolerances, etc., which are the result of experimentation, trial and error, cut and try. Thus the claim of trade secrets by National and by plaintiff in Midland-Ross have essentially the same basis. In Midland-Ross, the court found that the general principles for plastic extrusion machines were well known. Here the general principles of National's devices were well known, having been revealed for all to see in National's patents and being obvious from the devices themselves. What was lacking in Yokana, as in this case, was any evidence that, prior to defendant's competition, plaintiff considered the information which Yokana sought to use trade secrets. The court pointed out that plaintiff's blueprints in Midland-Ross were fur-

nished plaintiff's suppliers and customers and potential customers. The court found an absence of precautions on the part of plaintiff to keep secret information regarding its machines.

In concluding that defendant had not misused plaintiff's trade secrets, the court found that Yokana had no right to retain plaintiff's blueprints and ordered the return of all drawings and blueprints which he took from plaintiff.

In affirming (293 F.2d 411) the trial judge's findings, the Third Circuit Court of Appeals, through Judge Goodrich, stated (293 F.2d 412–413):

"We have before us in this case two perfectly well established principles. One is that an employee after leaving the service of an employer may carry on the same business on his own and use for his own benefits the things he had learned while in the earlier employment. If this were not so an apprentice who has worked up through the stages of journeyman and master workman could never become an entrepreneur on his own behalf. Any such system of quasi-serfdom has long since passed away. Necessarily the former employee may use what he learned in the former employer's business while engaged in business for himself or some business competing with the former employer. All this is set out in the Restatement of Agency, Second, §§ 396 and 393, especially in comment e (1958).

"Equally clear is the proposition that the employee owes a duty of loyalty to the employer. He must not, while employed, act contrary to the employer's interests and, in general terms, owes a duty of loyalty as one of the incidents of the employer-employee relationship. Restatement of Agency, Second, § 387. These two general propositions are well settled and, in the broad terms just stated, could not be successfully disputed by anyone. The question is on which side of the line the present case falls.

"The appellant makes much of a series of things which Yokana was said to have done while he was still in the employ of Midland-Ross. They may be summarized as follows:

"A. A proposal to customers named Moss which eventually resulted in the Mosses joining up with Yokana in his new enterprise;

"B. Yokana's attorney submitted a proposed agreement for the formation of the competing organization;

"C. Yokana accepted orders to be filled by his new corporation for business;

"D. He copied drawings of the employer in his possession;

"E. The defendant ordered some castings for his new enterprise;

"F. He ordered some machinery for it;

"G. He asked delivery specifying a date; and

"H. He went to a sales meeting of the plaintiff corporation just before he turned in his resignation.

"None of this excites us very much because before leaving employment a man may make plans for his new enterprise so long as he does not use his employer's time or any trade secrets in so doing. Restatement of Agency, Second, § 393, comment e (1958); Restatement of Torts, § 757 (1939).

"Just what is it then which makes a basis for a charge that this defendant violated his duty of loyalty to his employer? We do not see that there was any error on the part of the trial judge in not finding trade secrets involved in the manufacture of these extrusion machines by the defendant's former employer. The machines were exhibited along with a catalogue at trade shows. Anybody could see what they were. The drawings showing the various parts of the machine were sent to the manufacturers who made the parts without any agreement as to nondisclosure on the part of these manufacturers. The same is true of the

purchasers of the machines. They got whatever blueprints or drawings were necessary in order for these purchasers to order parts from the plaintiff manufacturers or others in case they needed replacement parts. After the present plaintiff took over from its predecessor, Hartig, the evidence shows some attempt at secrecy within the plant. But the events just related took place before that.

"An inspection of the machines manufactured by the plaintiff and its predecessor would disclose everything which the drawings of those machines set out. It is true one would have to have a machine and have it cleaned and not in operation in order to take the measurements. But we think it is indicated that any skilled engineer could form a set of drawings or blueprints for himself if he had opportunity with the parts of the machine before him. The court was correct in saying that there was no basis for injunctive relief against Yokana."

Although the following cases do not parallel the present case as closely as Yokana, our conclusion here is consistent with that reached in: National Welding Equipment Co. v. Hammon Precision Equipment Co. (N.D.Cal., S.D.), 165 F.Supp. 788 (limited copying by former officers of blueprints containing non-secret information did not justify injunction against unfair competition); Mycalex Corp. of America v. Pemco Corp. (D.C.Md.), 64 F.Supp. 420, affirmed (4th Cir.), 159 F.2d 907 (manufacturer's publications regarding its processes precluded relief on trade secret basis); Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430 (chemist who developed formulae for former employer and who was not limited upon the use to which he put knowledge so gained could not be enjoined from making use of information so acquired in employ of competitor of former employer); Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 213 A.2d 769 (former employee who had been to large extent responsible for the development of former employer's "know-how" not to be

enjoined from making use of such knowledge on behalf of subsequent employer, no restrictive contracts being involved).

National would distinguish these cases, largely on the basis that when an employment situation was involved, the activity of the former employee on behalf of a competitor did not take place until termination of the prior employment. However, our analysis of these cases leads us to conclude that the time of the activity is of minor importance by comparison with the nature of the knowledge and information involved and the nature of the employee's activity. If neither the nature of the information nor the nature of the activity justifies trade secret relief, the fact that the activity began prior to the termination of prior employment does not require that trade secret relief be granted. Midland-Ross Corp. v. Yokana, supra; National Welding Equipment Co. v. Hammon Precision Equipment Co., supra.

Not only are the facts of Midland-Ross Corporation v. Yokana comparable to those in this situation, but we find the relief afforded in that case also appropriate in this. In our opinion, National has not shown a right to injunctive relief on the basis of misuse of actual trade secrets or on the basis of such misconduct on the part of defendants which would entitle it to relief as if trade secrets were involved. However, Melvin and Vaccaro were guilty of the wrongful use of some minor items of National's property and materials. They were also guilty of misuse of its drawings or blueprints. In Midland-Ross the court ordered the return of drawings, blueprints and other documents of plaintiff in the possession of defendant. The trial court indicated that it would receive evidence upon the issue of damages, if any, " 'suffered by plaintiff in consequence of defendant's use of plaintiff's customer lists, cost calculations, and pricing data.' " In discussing this conclusion, the circuit court of appeals stated (293 F.2d 414): "We think there is also an item to be considered which is

whether by using the plaintiff's drawings and the like instead of making measurements themselves, defendants did not shortcut by improper use of plaintiff's material what they otherwise could have dug out through a more expensive, painful process. If all plaintiff's evidence in that respect should be true, we think that is an element also to be considered in determining what the defendant should be required to pay to the plaintiff."

Even in cases where the court has granted injunctive relief based upon the misuse of actual trade secrets, the courts have limited the term of the injunction to the time which would have been required to reproduce a copyable product. Thus in Schulenburg v. Signatrol, Inc., supra, relied on by National, the trial court's grant of a permanent injunction against defendant's further manufacture and sale of competing flashers was ordered modified by the Supreme Court. In this connection, the court stated (212 N.E.2d 869) :

"The bothersome aspect of the trial and appellate court decisions is the scope of the injunction that has been issued. It does not restrict its application as to time or geographical area. Defendants have, in effect, been put out of business for all time, everywhere. This clearly is not necessary to make plaintiffs whole as it is conceded by them that their products may legally be copied by competitors. Since defendants might have reproduced plaintiffs' flasher in this fashion, it is difficult to justify prohibition of such reproduction for a period of time longer than that required to duplicate the product by lawful means. The record contains no indication of the time so required, but such fact should be readily ascertainable since a Minnesota firm apparently did legally copy plaintiffs' product. Accordingly, we believe that the injunction should have been limited in duration to the period of time reasonably required for defendants to legally produce such copies. Since the original injunction has been stayed pending the determination of this appeal, we believe that justice will be served upon

remand by an order of the trial court ordering the enforcement of the original injunction pending a prompt determination of the period of time required for the reproduction of the flashers by lawful means. The injunction should then be modified to terminate upon the expiration of such time period."

In Winston Research Corp. v. Minnesota Min. & Mfg. Co., supra, likewise relied upon by National, the circuit court of appeals affirmed the trial court's decree of an injunction for a limited period of time. The injunction was limited to a period of two years on the theory that, when the product was finally placed on the market, it could have been reproduced within that time. In affirming the trial court's decree, the court of appeals stated (350 F.2d 142) :

"We think the district court's approach was sound. A permanent injunction would subvert the public's interest in allowing technical employees to make full use of their knowledge and skill and in fostering research and development. On the other hand, denial of any injunction at all would leave the faithless employee unpunished where, as here, no damages were awarded; and he and his new employer would retain the benefit of a headstart over legitimate competitors who did not have access to the trade secrets until they were publicly disclosed. By enjoining use of the trade secrets for the approximate period it would require a legitimate Mincom competitor to develop a successful machine after public disclosure of the secret information, the district court denied the employees any advantage from their faithlessness, placed Mincom in the position it would have occupied if the breach of confidence had not occurred prior to the public disclosure, and imposed the minimum restraint consistent with the realization of these objectives upon the utilization of the employees' skills."

See also Schreyer, et al. v. Casco Products Corporation, 2 Cir., 190 F.2d 921, 924.

In this case we find no evidence that defendants now have in their possession blue-

prints or drawings of National other than such drawings as National itself had distributed. Although the evidence does show the use of some information from National's drawings with respect to dimensions and tolerances, the drawings which were produced by the defendants with the aid of information from National's drawings, are not copies of its drawings such as might justify an order that the defendants' drawings be surrendered.

■ There is some evidence in the record regarding the time which might have been saved in the use of National's drawings, mainplates and materials. However, there was no definite attempt to establish such time at the trial and since, in any event, the issue of damages was reserved, we do not undertake to make a determination of that time period. This is a matter upon which evidence may be heard upon remand. The proper measure of damages is the loss to National from the misuse of their materials and drawings based upon the profits which National lost by reason of the competition of defendant Coin Acceptors during the time that company would not otherwise have been in the production of single coin devices but for the assistance obtained from the use of National's drawings, mainplates and materials.[5] The determination of the time involved should be made upon the basis of the manpower employed by defendants in their actual operation, not on the basis of what might have been accomplished with staffs of other size. Damages should also include National's loss of profits by reason of Vendo's production of 3-in-1 slug rejectors during such period of time as Vendo's production was accelerated by reason of the use of National's 3-in-1 drawings in Coin Acceptors' design of that product. Since we find no misuse of drawings or materials with respect to defendants' designs for one-cent and fifty-cent units and changers produced by Vendo, National is not entitled to recover for any loss of profits from sales of those items.

■ Melvin, the individual participant, is liable jointly with Coin Acceptors, on behalf of which he acted as an officer (see Solo Cup Company v. Paper Machinery Corporation (E.D.Wisc.), 240 F.Supp. 126, 141 [16–18]), to National for the damages so determined. As discussed below, we find no liability on the part of Vendo.

■ The individual defendants, Trieman and Pierz, are liable for damages to National for any misuse of its blueprints, mainplates, die castings, etc., brought about by the wrongful appropriation thereof by Melvin and Vaccaro, only if they knew or should have known of the incidents. See Solo Cup Company v. Paper Machinery Corporation, supra, 240 F.Supp. 142 [19, 20]; Pitman v. Walker, 187 Cal. 667, 203 P. 739, 740; Peckham v. Hendren, 76 Ind. 47, 53; Doane v. King (U.S.D.C., Minn. 1887), 30 F. 106, 107 (aff'd King v. Doane, 139 U.S. 166, 11 S.Ct. 465, 35 L.Ed. 84).

■■ The evidence here fails to show actual knowledge by Trieman of the misappropriation of Melvin and Vaccaro. Vaccaro's testimony that Trieman was present at Theis farm when Melvin asked Vaccaro to get some National blueprints fails to show knowledge on Trieman's part. Vaccaro testified he did not know whether Trieman heard the request. There was no evidence at all that Pierz was actually aware of the misuse of any National blueprint. Nor do we find evidence from which it can be concluded that either Trieman or Pierz should have known of the activity of Melvin and Vaccaro. Melvin's knowledge is imputable to neither Trieman nor Pierz. 14A C.J., Corporations, § 1867, p. 100.

We turn now to the question of Vendo's liability. Since we have concluded that

---

5. Since relief is not afforded on a trade-secret basis, accounting to National by defendants for their profits during the time in question, an appropriate remedy in trade-relief situations, should not be required. See International Industries, Inc. v. Warren Petroleum Corp. (3rd Cir.), 248 F.2d 696, 699 [2–4].

National had no protectible trade secrets, the trial court's finding that Vendo conspired with the other defendants to appropriate National's trade secrets must fall. However, the question arises whether Vendo should be held liable for damages for the wrongful use of National's property, personnel and blueprints.

The facts concerning the relationship of Vendo to the Boxer-Coin Acceptors operation follow. At a St. Louis convention of the National Automatic Merchandising Association held about November 1, 1958, George Hanson, chief engineer, and Spencer Childers, vice-president in charge of operations of Vendo, heard a rumor that Trieman might be intending to leave National and set up his own company. There was no discussion by Childers with Trieman during the convention or thereafter until June 24, 1959. At that time Trieman, as sales manager for National, was at Vendo's Kansas City plant on National's business, and he then told Childers and others (for the first time) that he was leaving National to go into business on his own. In February, 1959, according to Melvin, Trieman stated to him, Vaccaro and Handing that if they could pull together a "package of talent" he felt he might get some help from Vendo. Melvin testified on cross-examination that in the Trieman group there had been discussion of getting financing from other persons and companies than Vendo. Vaccaro testified that Vendo's name was not mentioned at the February, 1959 discussion, nor had he ever heard of anyone, including Trieman, contacting Vendo. Trieman testified that he never did contact Childers or Vendo between January 1, 1959 and June, 1959, and he denied making the statement testified to by Melvin.

Childers testified that between the 1958 convention and June 24, 1959, he never had a conversation with Trieman about his leaving National and forming a company of his own. He denied having any conversation with Trieman about giving financial support to the venture in the spring of 1959.

In the spring of 1959, Vendo acquired the Stoner Manufacturing Company of Aurora, Illinois, which company ultimately became the manufacturing site for Coin Acceptors-Vendo devices. Wagstaff, the chief executive officer of Vendo, testified that its attempts to purchase Stoner went back several years, the purchase contract and possession of assets of which were made in May, 1959, and closed on June 1, 1959. The acquisition discussion by Vendo's board of directors of Stoner was had November 3, 1958, as reflected by its minutes. In September, 1959, Childers reminded Wagstaff that the Stoner plant was acquired to give Vendo a complete line of vending machines for the trade, and that Stoner was well equipped to engage in manufacturing of coin-handling devices, which it had done since 1931 or 1932.

On July 10, 1959, Childers came to Boxer Tool and Engineering Company, in response to a call from Trieman, to see the Hereford Street facility, which he did after attending to other business in St. Louis. He observed that the group was then in production of at least one device. Childers met Melvin who was formerly a coinage engineer for National, as Trieman told him, and Trieman told him also that he had resigned from National and the name of his company was Boxer. Trieman and Melvin then drove Childers to the airport, during which drive Trieman told him of their plan to manufacture and sell a complete line of coin-handling equipment. Childers stated to Trieman that his proposed plan of financing the venture (by borrowing money from vending machine manufacturing companies and repaying it by special discounts to them) was impractical, and emphatically rejected the idea that Vendo make such a loan. Childers suggested that Trieman and Melvin become associated with Vendo to engage in a coinage program for it, but Trieman rejected that idea. Melvin testified that at this time financing only was discussed, and there was no discussion of Boxer doing any design work for Vendo. Childers did say that Vendo was extremely

interested in having a second source of supply of coin-handling equipment, and that whether anything was worked out between Vendo and Boxer, Vendo intended to proceed to set up its own manufacture of that equipment.

Trieman and Melvin went to Vendo's plant in Kansas City on July 28, 1959, and there met with Childers. Childers made a new proposal that the group design a complete line of coin-handling devices which Vendo would manufacture at Stoner. Vendo would use the quantity needed for its vending machines and would also sell exclusively to Boxer such quantity of the devices as Boxer wished, for sale under Boxer's name. The proposal included an option on Vendo's part to purchase half of Boxer. Trieman rejected the proposition, but asked that Vendo take a look at the group's financial picture, to which Childers agreed. On August 3, 1959, at Childers' direction, Frank Loncar, his administrative assistant, came to St. Louis to examine the group's projected operation and financial condition. He reported that the projected Boxer operation was not feasible and that Trieman's financing ideas were unrealistic.

As the result of a call from Trieman to Childers, Vendo's airplane picked up Trieman and Melvin in St. Louis, then Childers in Aurora, Illinois, on August 18, 1959, and flew them to Chicago for a meeting with Pierz to outline to him the proposal Childers made at the July 28 meeting. Pierz objected to selling equipment made by Vendo on the ground that Boxer's customers would not want Vendo to know how many vending machines they were selling. Childers answered that Vendo would not know the amounts sold by Boxer to its customers, which satisfied Pierz. Childers outlined his proposal that Vendo have an option for 5 years to buy 50% of Boxer, suggesting $150,000 as an option price, to which option Pierz, Melvin and Trieman all objected. Childers answered that the Boxer group might make a lot of money in the future based upon a huge investment that Vendo would make,

and Vendo should acquire a portion of Boxer to share in the benefit it would obtain.

At this meeting (August 18, 1959) Pierz stated that he had either already resigned or was in the process of resigning from National and had so advised Ray Gottfried, its executive. Childers did not thereafter direct any investigation relative to such resignation. At the meeting, Trieman, Pierz and Melvin did not indicate their agreement to Childers' proposal, but told him they would contact him later.

Following a call by Trieman to Childers, in which Trieman told Childers that he and his associates had further discussed the Chicago proposal and would like to see something in writing, Trieman and Melvin went to Vendo's plant in Kansas City on September 10 and 11, 1959. A conference was held at which Glenn I. Carbaugh, Vendo's house counsel, was present and made notes on the general terms of the proposal so he could prepare a rough draft of the agreement. From his notes, Carbaugh did prepare such rough draft which was available late on September 10. Carbaugh noted that Pierz was still National's employee and that Vendo was to do all of the manufacturing, including the device "now being made." He learned that Boxer's stock was owned by Trieman, Melvin and Pierz and that the latter was still employed by National and had an old employment contract with "Old" National (originally National Slug Rejectors, Inc.) containing a restrictive covenant against competing. During this meeting, according to Melvin, while Trieman and Childers were having lunch in Vendo's executive dining room, either Elmer or John Pierson (chairman of the board and president of Vendo, respectively) came by the luncheon table, but did not sit down, and said, "You boys be careful you don't get in jail," to which Trieman replied, "If we do I guess we will have to make these things in jail." Everybody had a big laugh and Pierson walked away. Trie-

man and Childers denied that the conversation occurred.

There were differences between the parties as to the rough draft of the contract, some of the terms of which were unsatisfactory to Trieman and Melvin, and it was arranged that Carbaugh would go to St. Louis for further conference with the Boxer group, which he did on September 15, 1959. Carbaugh then met with Trieman, Melvin and Mervyn Goodman, Boxer's secretary-treasurer. Carbaugh then noted that Trieman, Melvin and Goodman were former National employees, and that Pierz was still National's branch manager (in Chicago). He noted also that Melvin should make an "affidavit of invention of all present devices after March, 1959" (this was never done), that Boxer's limit of resources was October 1, and "Can we buy dies immediately to keep Boxer going?" He also made the notation: "Conspiracy—reliance on competent legal advice." Carbaugh's explanation of this latter notation was that part of the legal problems he had come to St. Louis to check had to do with Pierz. He had learned that Pierz once had an employment contract with "Old" National which contained a covenant not to compete, and he anticipated that Pierz would sign the contract with Vendo. Carbaugh was apprehensive about the matter and was determined that Vendo would not enter a contract which might involve another party to the same contract breaching a covenant not to compete. He felt that if the covenant not to compete were valid it might very well constitute a conspiracy among all of the parties to a proposed contract to induce this man to breach an enforceable covenant not to compete. Carbaugh learned also that only Pierz had ever signed a contract of employment with National. Carbaugh, whose duties with respect to the October 1, 1959 contract, below mentioned, were to prepare it, draft it, to investigate legal problems and to see that his client was protected from the legal aspects, had been instructed by Robert Wagstaff, Vendo's chief executive officer, to check on two areas of patent infringement and the possibility of restrictive covenants not to compete between National and its ex-employees. Carbaugh was acutely aware of National's position in the industry as the only manufacturer of a full line of coinage equipment, and that Vendo had bought all of its coin mechanisms from National; that National had enjoyed a virtual monopoly in the field for many years and would not "stand still for losing so much of their business." He thought that National would do everything in its power to retaliate against Vendo and the possibility of a suit by it against Vendo was likely (as did other Vendo officials, except Childers).

After legal research and conference with other counsel with respect to the possibility of a conspiracy claim on the Pierz agreement, Carbaugh came to the conclusion that the agreement was not enforceable, which conclusion he felt he had to reach in order to approve Vendo's entering the October 1, 1959 contract. Melvin advised Carbaugh, upon being questioned by him, that all the developmental work on Boxer's only product then, the single coin rejector, had been done since he had left National in March of 1959. Because of these positive statements, Carbaugh felt that an affidavit to the same effect would add nothing, and therefore made no requirement for it in the contract.

On September 29, 1959, Boxer changed its name to Coin Acceptors, Inc. The final draft of the contract was prepared by October 1, 1959, and was then signed by Vendo, Coin Acceptors, Trieman, Melvin and Pierz. The pertinent portions of this contract are: Preliminarily it is recited that Vendo is a manufacturer of vending machines of all types requiring the use of large numbers of coin-handling and coin-changing devices and that "Acceptors" (Coin Acceptors, Inc.) has the ability, know-how and engineering services to design various such devices for Vendo; the individual parties own all of the 2,000

shares of outstanding Class A common stock, and Acceptors is authorized to and intends to issue 1,000 of its 2,000 shares of Class B common stock to certain individuals to be associated with Acceptors but who are not parties to the agreement.

The contract further provides that all designs, inventions and patents shall be Vendo's property; that it shall produce coin changing and handling devices for its own use without further consideration, but that Acceptors shall be its exclusive distributor for sale to other parties of types of devices resulting from research and engineering services of Acceptors, as Vendo may determine to manufacture such devices for resale to be sold by Vendo to Acceptors at the lowest practicable price consistent with fair manufacturing profit. Paragraph 4 provides, "It is agreed that all technical information resulting from such services by Acceptors for Vendo is to be considered as confidential trade secrets and Vendo's property and Acceptors shall not reveal the same to any other parties without Vendo's permission. * * * This shall apply also to any research and development information in this field which Vendo may develop through its own research efforts and supply to Acceptors for use by Acceptors in the rendering of practical engineering services to Vendo." Acceptors agreed not to manufacture coin-changing or coin-handling devices except the one small coin acceptor device known as 500 Series (similar to National's single coin rejector, its 700 Series). Provision was made for Acceptors' employees entering into covenants for noncompetition for a reasonable time after discontinuance of employment, and that they would not reveal Acceptors' trade secrets without its permission. The individuals agreed that they had not entered into similar covenants with prior employers, or, in the alternative, they had been advised by reputable legal counsel that any such covenants were invalid. All represented that to the best of their present knowledge and belief no facts of any kind existed

that would prevent them from entering into and fully performing the agreement.

Vendo was given an option to purchase by September 30, 1964, 50% of Acceptors' Classes A and B common stock at a price of one-half the fair market value of its assets (not including patents, contract rights and other intangible assets), less liabilities, plus $200,000 cash.

On the contract date, Vendo paid to Coin Acceptors $16,000 agreed upon to be fair for engineering work previously done on the 3-in-1 rejector by the Boxer group back to March, 1959. Thereafter, Vendo paid Coin Acceptors upon being billed by it for hourly engineering services, less an $8,000 lump sum payment made each month.

By December 3, 1959, designs for the entire line of Vendo-Coin Acceptors' devices were about completed. The 500 Series single coin rejector was in production; detailed drawings of the 3-in-1 and 4-in-1 rejectors were completed; the fifty-cent rejector detailed drawings were completed; a ten-cent changer was then stated by Vendo's Boley Andrews (director of research) to be ready for testing by January 15, 1960; detailed engineering drawings of their electrical coin changer were dated November and December, 1959. On February 4, 1960, Vendo authorized Trieman to proceed to purchase tooling for the 3-in-1 rejector.

According to Melvin, in September, 1959, the Boxer group had in production (off the tooling) a ten-cent slug rejector, similar to National's 700 Series rejector, which he then showed to Childers who was not interested in this unit. He was, however, interested in the 3-in-1 and 4-in-1 rejector units, the uncompleted drawings for which were also shown him by Melvin. The 3-in-1 rejector was ready for tooling when Melvin left Coin Acceptors on April 9, 1960. He testified that for the 3-in-1 unit it would take anywhere from six to ten months to lay it out and get it ready for tooling, particularly if there were a number of people working on it. On Coin

Acceptors' 3-in-1 rejector the lay-out method and design took considerably more time and effort than it would have taken merely to duplicate National's like unit because the Boxer group made some changes which had to be proven. The Boxer group had rejectors of National and changers which were sold upon the open market, and which they measured. At the time Melvin left National's employ, around March, 1959, he had the general experience and know-how to duplicate by mere measurement and physical examination, without reference to any drawings or any memory he might have had from his employment, any of the slug rejectors such as National's 3-in-1, its 4-in-1, its fifty-cent unit and any coin changers sold on the open market. It would be easier to resort to drawings, and the Boxer group had both models and drawings of the single coin units and the 3-in-1 unit, but Melvin did not recall having any drawings of the coin changer. It took about a year to design and tool the single coin rejector. He did not testify as to time saved by use of whatever detailed drawings of National's units which the Boxer group had.

Vaccaro testified that a skilled mechanic could take apart a National single coin rejector and duplicate its parts piece by piece, and that if he (Vaccaro) were given enough time and good equipment he could duplicate the parts to within one thousandth of an inch; if he were going to manufacture it and set up tolerances, he would have problems; drawings could be made from duplicated parts, but he would not know how to set up the tolerances; a skilled man could work out his own tolerances, given enough time, and would not have to have National's drawings; to work out all these things might take a year's time.

Vendo's expert witness, C. T. Fishleigh, testified that in his opinion, taking into account all the various stages necessary to achieve full mass production, including the making of necessary drawings, obtaining tooling, conducting pilot runs off the tool-

ing, assembling of the pilot runs and checking them, a good engineering organization could be in full mass production of a 3-in-1 rejector (using National's 3-in-1 marketed product as a model) in from six months to a year.

In the fall of 1959, Coin Acceptors' staff was made up of Melvin, Haverstick, and the Lotspeichs, all former National employees and competent in the field of coin-handling devices.

On February 10, 1960, because Vendo was having trouble with its coin changer switches, its director of engineering, George Hanson, wrote Trieman as follows:

"The last time I was in St. Louis I had a discussion with you relative to attempting to develop a more reliable coin switch for use in changers and channel assemblies. We are still interested in this and have had some specific discussions with Micro on their switch.

"It would be very helpful for us if we could obtain prints or specifications covering the present Cherry, Micro and Acro switches used by National Rejectors.

"If you have any information on this or can obtain it for me, I would certainly appreciate it.

"My interest is primarily in all operating characteristics and in environmental conditions that these switches are designed to operate under."

A blueprint of Coin Acceptors' coin switches drawn by E. Umbright, bearing the date March 19, 1960, and initialed approved by "R.C.C." was produced. It is similar to National's coin switch drawing, dated October 30, 1958. "R.C.C." are the initials of Robert C. Chagnon, who on March 19, 1960, was still in National's employ. Chagnon testified that he had no contact with anyone at Coin Acceptors prior to being interviewed by Trieman for a job on July 25, 1960. Haverstick testified that in instances he placed his approval initials on a drawing after its date. Burzen and Trie-

**50**

man testified that National's coin switch drawings were fully given out by it, and its vice-president, Wallin, conceded that it was possible that National had sent out switch drawings to customers. National did not manufacture its switches, but worked out the specifications therefor.

Trieman testified that because of a conference of Melvin, Hanson and himself relative to the switch problem, and prior to Hanson's letter, he obtained a sample switch from the Cherry Company, which was tested and found satisfactory and was thereafter purchased and used in coin changers being manufactured. He had also contacted the Micro and Acro companies. He did not answer Hanson's letter because he regarded the problem as solved, and did not make an effort to obtain the specifications covering the present Cherry, Micro and Acro switches as used by National.

■ National alleges that a conspiracy existed among the individual defendants, Trieman and Melvin along with National's former employees, Vaccaro and Pierz, later joined by Vendo, to misappropriate National's trade secrets. The burden of proof to show that such conspiracy existed was and is upon National. Fitzpatrick v. Federer Realty Company, Mo., 351 S.W.2d 673, 682 [7, 8]; 15 C.J.S. Conspiracy § 28, p. 1042; 16 Am.Jur.2d Conspiracy § 59, p. 156. It is said in this state that a conspiracy must be proved by clear and convincing evidence, Fitzpatrick, supra; Woosley v. Wells, Mo., 281 S.W. 695, 700 (the evidence must do more than raise a suspicion); Walsh v. Walsh, 285 Mo. 181, 226 S.W. 236, 242; Abbott v. Miller, 226 Mo.App. 277, 41 S.W.2d 898, 901; Reger v. First Nat. Bank, 221 Mo. App. 54, 279 S.W. 1053, 1057 (substantial proof). A conspiracy may be, and often must be, established by circumstantial evidence, Sandler v. Schmidt, Mo., 263 S.W. 2d 35, 40; Rosen v. Alside, Inc., Mo., 248 S.W.2d 638, 644. If the proof, however, is such that it is as consistent with honesty and good faith as with a fraudulent pur-

pose it will be referred to the better motive, Walsh v. Walsh, supra, loc. cit. 226 S.W. 242; 15 C.J.S. Conspiracy § 30, p. 1047.

■ We rule that the evidence falls short of showing by inference or otherwise that a conspiracy to do an unlawful act existed among these parties and former employees. Note that the November 14, 1957 agreement recites only that "the purpose of this instrument is to implicate and bind each with the other for the ultimate purpose of starting a coin-handling business together." It says nothing about, and no other evidence reveals, a purpose to misappropriate any trade secrets. Vendo was not a party to that agreement, and there is no evidence that any person associated with Vendo had any knowledge of it at any time. Since there was no initial conspiracy there was nothing for Vendo to join.

■ The issue upon which Vendo's liability exists is whether there was a conspiracy formed and entered into to misappropriate and misuse any of National's property by the individual defendants, Coin Acceptors and Vendo at or about the time it was contacted by the Boxer group for financial assistance. The trial court's findings and conclusions rest upon a series of events (circumstantial evidence) from which he drew a series of inferences ultimately resulting in his finding that Vendo knowingly entered a conspiracy. In our independent and de novo evaluation of the evidence on this issue (as well as other determinative issues) we examine the record to ascertain if it reasonably supports the trial court's conclusion, giving deference to his superior position to see, hear the witnesses and adjudge their credibility, and we make our own findings and determine the weight of the evidence. Allison v. Mildred, Mo., 307 S.W.2d 447, 453.

■ There is no evidence that Vendo ever knew of the intention of Trieman to leave National other than the rumor which

Hanson and Childers heard at the St. Louis convention about November 1, 1958. Trieman himself advised Childers and others, on June 24, 1959, that he was going to leave National and go into business on his own. It was thereafter that Trieman called Childers to look over the Hereford Street plant. The thought that the Boxer group might get help from Vendo came from Trieman in February, 1959. Clearly, it was Trieman who initiated the dealings with Vendo, and there is no evidence that any person from Vendo contacted the Boxer group for the purpose of inducing them to leave National and utilizing their talents to any detriment of National. We follow the rule that an employee may leave his employment and establish a new enterprise in competition with the former employer, absent a valid restrictive covenant therefor, or breach of a confidential relationship, and in connection therewith utilize his knowledge, memory, skill and experience gained in the former employment. Sarkes Tarzian, Inc. v. Audio Devices, Inc. (D.C., S.D.Calif.1958), 166 F.Supp. 250, 264 [10, 11] (aff'd 9 Cir., 283 F.2d 695, cert. den. 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859), where it was said, "So there is agreement among the courts that, except, where *real* trade secrets are involved, an employee may compete with his former employer and use such knowledge and skill as he has developed in the former's employ. This accords with the main object of a free economy which is the basis of our industrial system"; Bickley v. Frutchey Bean Company (D.C., E.D.Mich.1959), 173 F. Supp. 516, 524 [8] (aff'd 6 Cir., 279 F.2d 685); Midland-Ross Corporation v. Yokana (D.C., D.N.J.1960), 185 F.Supp. 594, 602 (aff'd with directions, 3 Cir., 293 F.2d 411); Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 213 A.2d 769, 776; Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430, 434, quoting Pittsburgh Cut Wire Co. v. Sufrin, 350 Pa. 31, 38 A.2d 33, 34, "Where, however, an employer has no legally protectable trade secret, an employee's 'aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer and the right to use and expand these powers remains his property unless curtailed through some restrictive covenant entered into with the employer.'" See also Rest. Agency, Second § 393(e), p. 218. In the Wexler case, loc. cit. 160 A.2d 433 [2], the reasons for the rule are more expansively stated: "In this era of electronic, chemical, missile and atomic development, many skilled technicians and expert employees are currently in the process of developing potential trade secrets. Competition for personnel of this caliber is exceptionally keen, and the interchange of employment is commonplace. One has but to reach for his daily newspaper to appreciate the current market for such skilled employees. We must therefore be particularly mindful of any effect our decision in this case might have in disrupting this pattern of employee mobility, both in view of possible restraints upon an individual in the pursuit of his livelihood and the harm to the public in general in forestalling, to any extent widespread technological advances."

■■■■■ It is not here claimed that any of National's patents were infringed, and the evidence shows that Vendo was acutely aware of the status of National's patents—that some of its basic patents had expired, and, thus, the ideas and principles therein involved and previously protected were thrown upon the public domain. In this situation, in developing a competing business with National its ex-employees had the right also to measure, copy and reproduce for sale National's marketed devices, there being no longer any patents to protect it and thereby give it further monopoly. Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 231, 84 S.Ct. 784, 11 L.Ed.2d 661; National Welding E. Co. v. Hammon Precision E. Co. (D.C., N.D.Calif.1958), 165 F.Supp. 788, 796 [17]; Crescent Tool Co. v. Kilborn & Bishop Co. (2nd Cir. 1917), 247 F. 299, 300. The Boxer group, here, while still employees of National had fur-

ther the right to form the Boxer Tool & Engineering Company with which to compete with it upon termination of such employment. Midland-Ross Corporation v. Yokana (3rd Cir. 1961), 293 F.2d 411, 413 [3], where it was held that a man may make plans for his new enterprise so long as he does not use his employer's time or any trade secrets in so doing; and Hamilton Depositors Corporation v. Browne, 199 Ark. 953, 136 S.W.2d 1031, 1033 [3, 4], quoting Myers v. Roger J. Sullivan Company, 166 Mich. 193, 131 N.W. 521, 34 L.R.A.,N.S., 1217.

■ Vendo was entitled to rely upon the foregoing rules and principles of law in dealing with the Boxer group, ex-employees of National, and there is nothing in evidence which would put it on notice of any improper acts of any of the ex-employees with respect to National. With the exception of Pierz, all these men at the initial contact between them and Vendo were no longer employed by National, and Pierz assured Childers in Chicago that he was no longer employed by, or was in the process of terminating his employment with, National. There was no evidence that any Vendo official had any knowledge that the members of the Boxer group had used any National property (blueprints, mainplates, die castings, etc.), or that any planned or prepared for the enterprise on National's time. From this record and following the foregoing law we determine that no adverse inference can be drawn against Vendo by reason of the fact that it knew it was dealing with National's ex-employees so as to make Vendo knowingly a party to a conspiracy.

We attach no importance to the fact that Vendo acquired the Stoner Manufacturing Company of Aurora, Illinois, on June 1, 1959 (the closing date), as this was prior to the first contact by Trieman of the Vendo officials on June 24, 1959. Furthermore, Vendo's minutes reflect that its board of directors discussed the Stoner acquisition as early as November 3, 1958, long before there was any contact between Trieman and Vendo. There was no evidence from which an inference of knowledge of a conspiracy could be drawn that the acquisition of Stoner by Vendo gave it anything more than the means to set up a competing coin-handling manufacturing company. There was no evidence at all that the Boxer group figured in that acquisition.

■ With respect to National's contention that an adverse inference is to be drawn against Vendo, to show knowledge that it was entering a conspiracy, from the notes of its house counsel, Carbaugh, "Conspiracy—reliance on competent legal advice," we rule that it is just as reasonable to believe Carbaugh's explanation that it was to avoid a possible conspiracy in inducing Pierz' possible breach of covenant as it is to attribute to the notation a bad motive, and we prefer the former. Walsh v. Walsh, supra. An affidavit from Melvin that all work on the single coin rejector had been done since he left National's employ would have been merely an assurance between him and Vendo that he had done no improper act, and Carbaugh's feeling that such would add nothing in view of Melvin's positive statements in that respect is also just as reasonable as National's contention that an affidavit could not be gotten because it was not true.

■ That portion of the October 1, 1959 agreement among defendants that technical information resulting from services, research and development shall be considered confidential trade secrets does not show knowledge on the part of Vendo that it was joining any conspiracy, or even that it was dealing with the Coin Acceptors group in any trade secrets of National, as claimed by it. We regard that the parties to this instrument did merely what National failed to do in providing that such technical information should be trade secrets (whether such information actually arose to that status) as among the parties. No adverse inference against

Vendo can be drawn from the fact of inclusion of these phrases in the contract.

■ Apprehension on the part of Vendo's officials that it might be sued by National as a result of a substantial loss of its business in the competition justifies no adverse inference against Vendo. The evidence falls short of showing that Vendo's determination was without merit that it could legally enter into the contract with the Coin Acceptors group. The opinion was that National would do everything in its power to retaliate, and it would not stand still for losing so much of its business, but that Coin Acceptors' personnel was free to contract, including Pierz, whose "Old" National agreement was determined to be unenforceable.

We deem the remarks between Trieman and the Vendo official, Pierson, at the September 10, 1959 meeting to be as reasonably construed as facetious as an acknowledgment that the parties were engaged in a nefarious activity, and thus no adverse inference should be drawn against Vendo from that evidence. Again, Walsh v. Walsh, supra.

■ The fact that Vendo paid Coin Acceptors $16,000 (adjusted later to $16,-318.70) on a detailed hourly statement going back to March, 1959 (through September, 1959), does not justify an inference that Vendo knowingly paid that amount for time expended by the individual defendants while they were in National's employ. The detailed hourly statement shows 21 hours spent by Melvin in March, 1959, and he testified that this was after he left National. The evidence does not show that Vendo paid Coin Acceptors for work on any rejector device done on National's time by any of its former employees.

■ There is no evidence that Vendo knew that National had or claimed to have any trade secrets with respect to its marketed devices. Indeed, we have held above that it did not have trade secrets in the

usual, technical sense. Thus, the speed by which Coin Acceptors' work proceeded is not, in our opinion, significant. As noted, National's detailed drawings were widely circulated without restriction as to use and were thus available to the coin-handling industry. These former employees of National were highly skilled personnel, capable of developing these devices quickly, as the evidence shows. We rule that no adverse inference can be drawn against Vendo because of the completion for the entire line of Vendo-Coin Acceptors' devices being made by December 3, 1959, production being ordered by February, 1960, and that the 3-in-1 rejector was ready for tooling when Melvin left Coin Acceptors in April, 1960. Although, as we have held, two members of the Boxer group had access to and gained advantage from improper use of National's drawings, there is no evidence that Vendo had any knowledge that any of National's former employees had misappropriated and had in their possession any of the same. National, however, urges that the Hanson letter of February 10, 1960, shows a request, complied with by Trieman, to obtain National's blueprint of its coin switch. Note that the letter does not make a request that Trieman procure one of National's prints of its switch, but only that it would be helpful "if we could obtain prints or specifications covering the present Cherry, Micro and Acro switches used by National Rejectors." The evidence shows that this switch drawing was freely given out by National—Wallin testified that possibly this was so. National did not manufacture its switches, but made .up specifications therefor for use by its supplier, and there is no evidence of any restriction upon that information. Trieman testified that he obtained a satisfactory sample switch from the Cherry Company, which was used, and he made no effort to obtain the specifications. There is no evidence that Coin Acceptors' switch drawing was furnished to Vendo in response to Hanson's letter. Although the source of the coin switch drawing is not explained, we can draw no

inference that it was produced, at Vendo's request, by the misappropriation of National's detailed drawings.

The inferences which National desires us to draw to conclude that Vendo was a party to a conspiracy to appropriate National's drawings are not justified on the whole record. Compare Conmar Products Corp. v. Universal Slide Fastener Co. (2nd Cir. 1949), 172 F.2d 150, 155. There was no direct evidence on the subject— each witness testified that he had no information that Vendo knew of any use by Melvin or Vaccaro of National's detailed blueprints, or of any other improper acts of their group.

National has failed in its necessary burden of proof to show a basis for liability on the part of Vendo. The judgment and decree against the Vendo Company should be reversed.

The judgment and decree appealed from is set aside. The cause is remanded to the trial court:

1. With directions to enter a new decree in favor of the individual defendants Trieman and Pierz and the defendant Vendo, and against the plaintiffs on their alleged cause of action against said defendants.

2. For further proceedings as to the defendants Melvin and Coin Acceptors, Inc., for the determination of the damages which plaintiffs may be entitled to recover against such defendants, in accordance with the views herein expressed.

PER CURIAM.

The foregoing opinion by WELBORN, C., and PRITCHARD, C., is adopted as the opinion of the court.

HYDE, Acting C. J., HOLMAN, HENLEY, FINCH, EAGER and DONNELLY, JJ., and STONE, Special Judge, concur.

STORCKMAN, C. J., not sitting.